UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

DR. DEIRDRE CHIARAMONTE,

                Plaintiff,

- against -

THE ANIMAL MEDICAL CENTER and
KATHRYN COYNE,

                Defendants.
------------------------------------X

Case No. 13 Civ. 5117 (KPF)

AMENDED COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

       Plaintiff, Dr. Deirdre Chiaramonte ("Chiaramonte" or "plaintiff"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants The Animal Medical Center ("AMC") and Kathryn Coyne ("Coyne") (collectively "defendants"), as follows:

### NATURE OF CLAIMS

       1.    This is an action to remedy discrimination on the basis of sex for defendant AMC's failure to pay male and female employees equal wages in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"), and the New York State Labor Law § 194 (the "Labor Law"); for tortious interference with prospective business relations; and for defamation.

       2.    Plaintiff seeks compensatory, liquidated, and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief.

### JURISDICTION AND VENUE

       3.    Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and the EPA, 29 U.S.C. § 216(b). This Court has supplemental jurisdiction over plaintiff's Labor Law and common law claims pursuant to 28 U.S.C. § 1367.

569594 v1

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

## PARTIES

5. Chiaramonte is a Doctor of Veterinary Medicine who did her internship and residency at AMC and then worked for AMC from 2002 until her employment was involuntarily terminated on July 24, 2012.

6. Upon information and belief, AMC is a New York not-for-profit corporation and veterinary teaching hospital. AMC is an employer within the meaning of the EPA and the Labor Law.

7. Coyne has been the Chief Executive Officer ("CEO") of AMC since March 2010.

## FACTUAL ALLEGATIONS

8. Chiaramonte received her Doctorate of Veterinary Medicine from Tufts University School of Veterinary Medicine in 1997. She completed an internship in small animal medicine and surgery at AMC in 1998 and a small animal internal medicine residency at AMC in 2002. She became a Diplomate of the American College Of Veterinary Internal Medicine in 2004. Chiaramonte is certified in canine rehabilitation and is in the process of becoming certified in acupuncture and canine massage therapy.

9. At the conclusion of Chiaramonte's residency in July 2002, AMC hired her as an associate staff veterinarian. In 2004, after becoming board-certified by the American College Of Veterinary Internal Medicine, AMC changed her status to staff veterinary internist. AMC gave Chiaramonte a raise with the new title.

569594 v1

10. In or about 2002, Chairman of the Board Cynthia Phipps; then-CEO Guy Pidgeon ("Pidgeon"); and Deena Wolfson ("Wolfson"), then-Executive Secretary to Pidgeon, Board of Trustees Liaison and Board Assistant Secretary, asked Chiaramonte to run a program that in 2004 was formalized as the President's Council, a special service that was provided to the pets of Board members, Board members' friends, donors, and certain other pets whose owners paid an annual premium for the service. Chiaramonte managed the President's Council in addition to her other duties as the veterinary internist on Medical Service 1. She was the primary veterinarian who provided medical care to the animals treated through the Council. Any new Council patients were assigned to Chiaramonte if they did not already have a primary veterinarian. If specialty care was needed, Chiaramonte remained a key part of the team providing medical care.

11. In or about April 2005, Chiaramonte helped to establish a Rehabilitation and Fitness Service at AMC with Tina Flaherty, a member of the Board of Trustees. Once the Service was established, Chiaramonte was responsible for running it.

12. In or about August 2003 AMC offered Chiaramonte the opportunity to rent an apartment in a building owned by AMC, which she accepted.

13. Throughout her employment with AMC, Chiaramonte received very positive performance evaluations, as well as praise and appreciation from her supervisors, Board members, and the owners of her patients. Chiaramonte made herself available to her patients' owners on nights and weekends by telephone and email.

14. Coyne became the CEO of AMC in or about March 2010.

15. In the summer of 2010, Wolfson, who had worked at AMC for about 45 years and whose last role at AMC had been as Chiaramonte's assistant for the President's Council, decided to retire.

16. Coyne suggested that AMC hire her sister, Margaret Barron ("Barron"), to replace Wolfson as Chiaramonte's assistant. Chiaramonte and others were opposed to hiring Barron, as she was not qualified for the position. Coyne hired Barron despite the objections.

17. Chiaramonte was out on maternity leave from August to October 2010. When she returned to AMC, she heard complaints from other doctors, technicians, and patients' owners about Barron, including from employees and patients' owners who refused to deal with Barron.

18. Chiaramonte soon understood why others were complaining about Barron. Chiaramonte raised concerns to Coyne, Board members, and Dr. Bill Muir ("Muir"), then the Chief Medical Officer, about Barron's performance, including that Barron could not perform simple tasks and frequently scheduled appointments and procedures with the wrong doctors. Chiaramonte said that Barron's performance was hindering animal care and could be dangerous to patients. AMC refused to deal with the issues raised.

19. In July 2011, Chiaramonte was supposed to review Barron's performance, on or about the anniversary date of Barron's hiring. The review was initially delayed because Linda Faison ("Faison"), Director of Human Resources, would not give Chiaramonte the new AMC review template because, she said, Barron did not fit into any listed categories and did not fulfill the requirements of the previous assistant. When Chiaramonte got the template, she prepared a review that was critical of Barron's performance in several respects, providing detailed examples of performance deficiencies and suggesting appropriate training. Chiaramonte met with Faison several times to discuss the review and make sure it was appropriate. Chiaramonte then shared the review with Dr. Richard Goldstein ("Goldstein"), Chairman of Medicine, who had offered to conduct Barron's review with Chiaramonte. However, about a week later, Goldstein told Chiaramonte that

he was sorry, but that he had shown the review to Coyne and that Coyne had said the review was "wrong" and directed that it not be given to Barron. Chiaramonte complied, but continued to ask Goldstein what she should do about Barron's performance problems.

20. In or about mid-October 2011, Chiaramonte received her own annual performance review from Muir, with Goldstein present. Muir gave Chiaramonte a positive review and did not criticize Chiaramonte's performance. Muir said that he recognized that Barron was incompetent and had damaged the President' Council, and apologized to Chiaramonte that he had no power to remove her because she was Coyne's sister.

21. Barron continued to have performance problems after July 2011. Chiaramonte continued to express concern about Barron's performance issues to Board members, most often to Elaine Langone.

22. In July 2012, Chiaramonte was due to give Barron another performance review.

23. On July 24, 2012, Chiaramonte was called into a meeting with Faison, Coyne, and Goldstein. They told Chiaramonte that her employment was terminated effective immediately, purportedly because (1) she had mismanaged the Rehabilitation and Fitness Service; (2) she had made medical mistakes; and (3) she had engaged in inappropriate behavior with Board members and staff. They did not provide Chiaramonte with any examples or explanation for the alleged grounds. There was no basis for any of the grounds. They also gave Chiaramonte a severance agreement that would have required Chiaramonte and her family to vacate their apartment by the end of August 2012.

24. Upon information and belief, Coyne, acting against the interests of AMC and in her own personal interests, provided false information to the Board in order to fire Chiaramonte, a

5

dedicated and skilled veterinarian, and thus protect the employment of her professionally incompetent sister, Barron.

25. Upon information and belief, Coyne provided the Board and patients' owners who called to complain about Chiaramonte's firing false information about the care of two animals, blaming Chiaramonte for errors. Coyne knew the allegations against Chiaramonte were false.

26. Upon information and belief, Coyne told the Board and staff that Chiaramonte called staff "black" or "blackie." Upon information and belief, Coyne told two African-American AMC employees that Chiaramonte had been fired because she called them both "blackie." Chiaramonte had never made such comments. In fact, it was Coyne who referred to the employees as "blackie."

27. On August 23, 2012, AMC had served on Chiaramonte a notice to quit her apartment by September 20, 2012.

28. On October 3, 2012, AMC commenced eviction proceedings, and had the papers served on Chiaramonte, her husband, and her minor children.

29. The action to evict Chiaramonte and her family was resolved in the fall of 2012.

30. Upon information and belief, male veterinarians employed by AMC whose credentials and skills are comparable to Chiaramonte's were paid higher compensation than was Chiaramonte for equal work.

31. For example, upon information or belief, Dr. Doug Palma ("Palma"), also a veterinarian, earned approximately $50,000 more than Chiaramonte did in 2011. Both Chiaramonte and Palma are board-certified in Internal Medicine. Palma graduated from veterinary school seven years after and became board-certified four years later than Chiaramonte

did. Unlike Chiaramonte, Palma worked only four days per week and did not have additional responsibilities at the President's Council or the Rehabilitation and Fitness Clinic. If one adjusts Palma's pay-rate to a five-day work week, the differential between his and Chiaramonte's yearly income would be over $80,000.

32. Upon information or belief, Dr. Chick Weisse ("Weisse") earned over $12,000 more than Dr. Janet Kovac McClaran ("McClaran") did in 2011. Both are board-certified surgeons who graduated from top-tier veterinary schools the same year. Weisse worked at AMC three weeks out of the month, whereas McClaran worked four. If one adjusts Weisse's pay-rate to account for his reduced schedule, the income differential would be in the six figures.

## FIRST CAUSE OF ACTION

### Discrimination Under the EPA (Against AMC)

33. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 of the Complaint.

34. By the acts and practices described above, defendant AMC, in violation of the EPA, has discriminated against plaintiff by paying male employees higher wages than plaintiff was paid for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

35. Defendant AMC knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiff's statutorily protected rights.

36. Plaintiff suffered lost wages as a result of AMC's willful and unlawful conduct.

7

## SECOND CAUSE OF ACTION

### Discrimination Under the Labor Law (Against AMC)

37. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 34 of the Complaint.

38. By the acts and practices described above, defendant AMC has discriminated against plaintiff by paying male employees higher wages than plaintiff was paid for equal work in a job, the performance of which required equal skill, effort, and responsibility, and which was performed under similar working conditions, in violation of the New York State Labor Law.

39. Defendant AMC knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiff's statutorily protected rights.

40. Plaintiff suffered lost wages as a result of AMC's willful and unlawful conduct.

## THIRD CAUSE OF ACTION

### Tortious Interference (Against Coyne)

41. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 38 of the Complaint.

42. Defendant Coyne made false and defamatory statements about plaintiff, with malice, in order to terminate plaintiff's business relationship with defendant AMC.

43. Defendant Coyne acted outside her role as CEO, contrary to the interests of AMC, and in furtherance of her own personal agenda.

44. Plaintiff has suffered and will continue to suffer compensable damage unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### Defamation (Against Coyne)

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 42 of the Complaint.

46. Defendant Coyne defamed plaintiff by slander *per se* by intentionally making false statements about plaintiff's care of animals and falsely accusing her of making racist statements.

47. Defendant Coyne also defamed plaintiff by slander, causing damage to plaintiff's reputation and costing plaintiff her job with AMC.

48. Coyne made the defamatory statements with malice.

49. Plaintiff has suffered and will continue to suffer compensable damage, including but not limited to the loss of income and benefits and the loss of her home, as well as damage to her reputation, unless and until this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court:

a. declare the acts and practices complained of herein to be violations of the EPA, the Labor Law, and New York common law.

b. enjoin and permanently restrain these violations of the EPA, the Labor Law, and New York common law;

c. direct defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

   d.  award compensation to plaintiff to compensate for the eviction of her family from its home;

   e.  award plaintiff damages to make her whole for all earnings she would have received but for defendants' conduct, including, but not limited to, wages, commissions, bonuses, pension and retirement, health care coverage and other lost benefits;

   f.  award plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and damage to reputation;

   g.  direct defendant Coyne to pay an additional amount as punitive damages;

   h.  direct defendant AMC to pay liquidated damages under the EPA and Labor Law;

   i.  award plaintiff damages to compensate for any adverse tax consequences;

   j.  award pre-judgment interest;

   k.  award plaintiff attorneys' fees, costs and disbursements;

l.  award plaintiff such additional relief as the Court may deem just and proper.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
   November 15, 2013

               VLADECK, WALDMAN, ELIAS &
               ENGELHARD, P.C.

By: /s/ Anne C. Vladeck

               Anne C. Vladeck
               Anne L. Clark
               Attorneys for Plaintiff
               1501 Broadway, Suite 800
               New York, New York  10036
               (212) 403-7300

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DR. DEIRDRE CHIARAMONTE,

           Plaintiff,

Case No. 13 Civ. 5117 (KPF)

- against -

THE ANIMAL MEDICAL CENTER and
KATHRYN COYNE,

           Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## CERTIFICATE OF SERVICE

This is to certify that the undersigned caused a copy of the plaintiff's Amended Complaint to be served by first class mail on November 15, 2013, upon Louis P. DiLorenzo, Esq. at Bond, Schoeneck & King, PLLC, attorneys for defendants, at 330 Madison Avenue, 39 Floor, New York, NY, 10017.

Dated: New York, New York
       November 15, 2013

                                         VLADECK, WALDMAN, ELIAS &
                                         ENGELHARD, P.C.

               By: _____
                                     Anne L. Clark (AC 6456)
                                     Attorneys for Plaintiff
                                     1501 Broadway, Suite 800
                                     New York, New York 10036
                                     (212) 403-7300

549704v1