UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DR. DEIRDRE CHIARAMONTE,

                                        13 Civ. 5117 (KPF)

               Plaintiff,

     - against -

THE ANIMAL MEDICAL CENTER and
KATHRYN COYNE,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

=======================================================================
PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
=======================================================================

VLADECK, WALDMAN, ELIAS &
  ENGELHARD, P.C.
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

Of Counsel:
     Anne C. Vladeck
     Anne L. Clark
     Ming-Qi Chu

684227 v1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 1

ARGUMENT ........................................................................................................................ 12

    I.   SUMMARY JUDGMENT STANDARD ................................................................ 12

    II.   PLAINTIFF'S DEFAMATION CLAIM SHOULD NOT BE DISMISSED.................... 12

        A.  Coyne's Statements Were False .................................................................. 13

        B.  Coyne Made Statements of Fact.................................................................. 15

        C.  Coyne's Statements Were Not Privileged ................................................... 16

    III.  COYNE TORTIOUSLY INTERFERED WITH  PLAINTIFF'S PROSPECTIVE
        BUSINESS RELATIONSHIP ............................................................................ 19

        A.  Coyne Was a Third Party to Plaintiff's Relationship to AMC ...................... 19

        B.  Coyne Used Improper Means........................................................................ 20

        C.  Coyne Acted for the Sole Purpose of Harming Plaintiff................................ 20

        D.  Coyne Interfered with the Relationship ...................................................... 21

    IV.  THE COURT SHOULD DRAW AN ADVERSE INFERENCEFROM DEFENDANTS'
        DESTRUCTION OF EVIDENCE ..................................................................... 22

    V.  PLAINTIFF'S EQUAL PAY CLAIMS SHOULD NOT BE DISMISSED .................... 23

        A.  Plaintiff Has Demonstrated that Men Were Paid More for Equal Work ........ 24

        B.  AMC Cannot Meet Its Burden of Proof on Affirmative Defense ................... 28

CONCLUSION..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

Aaronson v. Wiersma,
   65 N.Y.2d 592 (1985) ...........................................................................................................15

Albert v. Loksen,
   239 F.3d 256 (2d Cir. 2001)............................................................................................ *passim*

Allcar Motor Parts Corp. v. Fed.-Mogul Corp.,
   No. 96 Civ. 4419 (JFK), 1998 WL 671448 (S.D.N.Y. Sept. 29, 1998)...................................21

Armodei v. New York State Chiropractic Ass'n,
   160 A.D.2d 279 (1st Dep't 1990)...........................................................................................15

Atl. Richfield Co. v. Triad Petroleum, Inc.,
   120 F.R.D. 471 (S.D.N.Y. 1988) ...........................................................................................21

Belfi v. Prendergast,
   191 F.3d 129 (2d Cir. 1999)...................................................................................................24

Brattis v. Rainbow Adver. Holdings, LLC,
   No. 99 Civ. 10144 (NRB), 2000 WL 702921 (S.D.N.Y. May 31, 2000)................................15

Brian v. Richardson,
   87 N.Y.2d 46 (1995) ..............................................................................................................15

Byrnie v. Town of Cromwell, Bd. Of Educ.,
   243 F.3d 93 (2d Cir. 2001)...............................................................................................22, 23

Carvel Corp. v. Noonan,
   3 N.Y.3d 182,191 (2004) .......................................................................................................21

Chepak v. New York City Health & Hosps. Corp.,
   No. 11-CV-9698 (KBF), 2015 WL 509279 (S.D.N.Y. Feb. 5, 2015), appeal filed,
   Docket No. 15-679..................................................................................................................27

Chin v. Port Auth. of N.Y. and N.J.,
   685 F.3d 135 (2d Cir. 2012)...................................................................................................22

Cohen v. Davis,
   926 F. Supp. 399 (S.D.N.Y. 1996) ........................................................................................20

Colodney v. Continuum Health Partners, Inc.,
   No. 03 Civ. 7276 (DLC), 2004 WL 829158 (S.D.N.Y. Apr. 15, 2004) ..................................13

684227 v1

Conigliaro v. Horace Mann Sch.,
    No. 95 Civ. 3555 (CSH), 2000 WL 45439 (S.D.N.Y. Jan. 19, 2000) ....................................28

DeRosa v. Nat'l Envelope Corp.,
    595 F.3d 99 (2d Cir. 2010)........................................................................................................12

Donofrio-Ferrezza v. Nier,
    No. 04 Civ. 1162 (PKC), 2005 WL 2312477 (S.D.N.Y. Sept. 21, 2005) ........................19, 21

Downes v. JP Morgan Chase & Co.,
    No. 03 Civ. 8991 (GEL)(MHD), 2006 WL 785278 (S.D.N.Y. Mar. 21, 2006) .....................27

Drury v. Waterfront Media, Inc.,
    No. 05 Civ. 10646 (JSR), 2007 WL 737486 (S.D.N.Y. Mar. 8, 2007) ...................................28

E.E.O.C. v. Port Auth. of New York & New Jersey,
    No. 10 Civ. 7462 (NRB), 2012 WL 1758128 (S.D.N.Y. May 17, 2012)................................28

Engelmann v. Nat'l Broad. Co.,
    No. 94 Civ. 5616 (MBM)(AJP), 1995 WL 214500 (S.D.N.Y. Apr. 10, 1995) .....................21

Farrell v. Hellen,
    367 F. Supp. 2d 491 (S.D.N.Y. 2005)....................................................................................19

Fisher v. Vassar Coll.,
    70 F.3d 1420 (2d Cir. 1995)....................................................................................................24

Forden v. Bristol Myers Squibb,
    63 F. App'x 14 (2d Cir. 2003).................................................................................................27

Friedman v. Wahrsager,
    848 F. Supp. 2d 278 (E.D.N.Y. 2012) ...................................................................................20

Gerbush v. Hunt Real Estate Corp.,
    79 F. Supp. 2d 260 (W.D.N.Y. 1999) ....................................................................................28

Gibson v. Jacob K. Javits Convention Ctr.,
    No. 95 Civ. 9728 (LAP), 1998 WL 132796 (S.D.N.Y. Mar. 23, 1998) .................................28

Grier v. Johnson,
    232 A.D.2d 846 (3d Dep't 1996)............................................................................................19

Herlihy v. Metro. Museum of Art,
    214 A.D.2d 250 (1st Dep't 1995) .....................................................................................16, 18

Heskin v. Insite Adver., Inc.,
    No. 03 Civ. 2598 (GBD)(AJP), 2005 WL 407646 (S.D.N.Y. Feb. 22, 2005)........................20

Hofmann v. Dist. Council 37,
    No. 99 Civ. 8636 (KMW)(JCF), 2004 WL 1936242 (S.D.N.Y. Aug. 31, 2004) ...................20

Hollander v. Cayton,
    145 A.D.2d 605 (2d Dept' 1988)...........................................................................15

Ibraheem v. Wackenhut Servs., Inc.,
    29 F. Supp. 3d 196 (E.D.N.Y. 2014) ...................................................................19

In re Dana Corp.,
    574 F.3d 129 (2d Cir. 2009)..................................................................................19

Kaytor v. Elec. Boat Corp.,
    609 F.3d 537 (2d Cir. 2010)..................................................................................12

Kim v. Dvorak,
    230 A.D.2d 286 (3d Dep't 1997)..........................................................................15

Kronisch v. United States,
    150 F.3d 112 (2d Cir. 1998)..................................................................................23

Krynicki v. Penthouse Media Group, Inc.,
    368 B.R. 334 (Bankr. S.D.N.Y. 2007) .................................................................22

Lavin-McEleney v. Marist Coll.,
    239 F.3d 476 (2d Cir. 2001)............................................................................24, 26

Liberman v. Gelstein,
    80 N.Y.2d 429 (1992) ...........................................................................................19

Maillet v. Frontpoint Partners, LLC,
    No. 02 Civ. 7865 (GBD), 2003 WL 21355218 (S.D.N.Y. June 10, 2003).............21

Markovic v. New York City Sch. Constr. Auth.,
    No. 99 Civ. 10339 (AGS), 2002 WL 22043 (S.D.N.Y. Jan. 8, 2002) ....................21

Meloff v. New York Life Ins. Co.,
    240 F.3d 138 (2d Cir. 2001)..................................................................................19

Micalizzi v. Ciamarra,
    206 F. Supp. 2d 564 (S.D.N.Y. 2002)...................................................................19

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,
    685 F. Supp. 2d 456 (S.D.N.Y. 2010)...................................................................22

Pisani v. Staten Island Univ. Hosp.,
    No. 06-CV-1016 (JFB)(MLO), 2008 WL 1771922 (E.D.N.Y. Apr. 15, 2008)......13

Raco v. Gen. Elec., Co.,
    No. 95-CV-0062, 1006 ..........................................................................................24

Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.,
    673 F.3d 294 (4th Cir. 2012) ................................................................................28

Reeves v. Sanderson Plumbing Prods, Inc.,
    530 U.S. 133 (2000)..................................................................................................12, 13

Residential Funding Corp. v. DeGeorge Fin. Corp.,
    306 F.3d 99 (2d Cir. 2002)........................................................................................23

Rodriguez v. Amer. Friends of Hebrew Univ.,
    No 96 Civ. 240 (JGK), 1998 WL 146227 (S.D.N.Y. Mar. 25, 1998) ....................21

Ryduchowski v. Port Auth. of New York & New Jersey,
    203 F.3d 135 (2d Cir. 2000)................................................................................28, 29

Scelfo v. Aurora Concept Inc.,
    NO. 02 Civ. 7835 (MHD), 2006 WL 336038 (S.D.N.Y. Feb. 10, 2006) .........................27, 30

Shah v. Lumiere,
    No. 13 Civ. 2975 (LGS), 2013 WL 6283585 (S.D.N.Y. Dec. 3, 2013) .................................20

Sigmon v. Parker Chapin Flattau & Klimpl,
    901 F. Supp. 667 (S.D.N.Y. 1995) .........................................................................28

Snyder v. Sony Music Entm't, Inc.,
    252 A.D.2d 294 (1st Dep't 1999).............................................................................22

Steinhilber v. Alphonse,
    68 N.Y.2d 283 (1986).................................................................................................15

Swanston v. Pataki,
    No. 97 Civ. 9406 (MJL)(KTD), 1999 WL 504905 (S.D.N.Y. July 15, 1999) .......................21

Tolan v. Cotton,
    134 S. Ct. 1861 (2014)................................................................................................12

Tomasino v. Mount Sinai Med. Ctr. & Hosp.,
    No. 97 Civ. 5252 (TPG), 2003 WL 1193726 (S.D.N.Y. Mar. 13, 2003) ..............................19

Tomka v. Seiler Corp.,
    66 F.3d 1295 (2d Cir. 1995).........................................................................24, 28, 29

Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.,
    No. 05 Civ. 10856 (GEL), 2008 WL 4356219 (S.D.N.Y. Sept. 23, 2008)..........................24

Williams v. Varig Brazilian Airlines,
    169 A.D.2d 434 (1st Dep't 1991)..............................................................................15

**STATUTES**

Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA").................................................................1, 23, 30

New York State Labor Law § 194 (the "Labor Law")......................................................1, 23, 30

**OTHER AUTHORITIES**

29 C.F.R. § 1620.13 ................................................................................................................24

29 C.F.R. § 1620.14 ................................................................................................................24

29 C.F.R. § 1620.14(c) ...........................................................................................................26

29 C.F.R. § 1620.15(a) ...........................................................................................................26

29 C.F.R. § 1620.16(a) ...........................................................................................................27

29 C.F.R. § 1620.17(a) ...........................................................................................................27

29 C.F.R. § 1620.18(a) ...........................................................................................................27

Fed. R. Civ. P. 15(b)(1) ..........................................................................................................13

<u>PRELIMINARY STATEMENT</u>

Plaintiff Dr. Deirdre Chiaramonte ("Chiaramonte" or "plaintiff") submits this memorandum of law in opposition to the motion for summary judgment filed by defendants The Animal Medical Center ("AMC") and Kathryn Coyne ("Coyne") (collectively "defendants"). Plaintiff brought this action to remedy discrimination on the basis of sex for defendant AMC's failure to pay male and female employees equal wages in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"), and the New York State Labor Law § 194 (the "Labor Law"), and for Coyne's defamation and tortious interference with prospective business relations.

Chiaramonte had a long and successful career as a veterinarian at AMC, until Coyne hired her sister to work for Chiaramonte knowing she was not qualified for the job. Coyne then fought to protect her sister by attacking Chiaramonte's competence and character. Eventually, Coyne told a series of damaging lies to the AMC Board of Trustees in order to gain the Trustees' support to fire Chiaramonte. Through discovery, Chiaramonte confirmed her suspicions that she (and other female veterinarians) were paid less than substantially equal male doctors.

In seeking dismissal of this case, defendants ignore a controlling Second Circuit decision, fill their statement of "Material Undisputed Facts" ("Def. 56.1") with irrelevant details of the procedural history of the case and allegations unrelated to their legal arguments (Def. 56.1 ¶¶ 7-28, 329-39, 365), ignore facts in plaintiff's favor, and construe all facts in their favor, all in contravention of the governing standards. Key facts are disputed and, when analyzed in the light most favorable to plaintiff, under the correct legal standards, summary judgment must be denied.

<u>STATEMENT OF FACTS</u>[1]

<u>Chiaramonte's Employment with AMC</u>

After Chiaramonte obtained her Doctorate of Veterinary Medicine, she completed an

---

[1] A more detailed statement of facts is contained in Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1").

internship in small animal medicine and surgery at AMC in 1998. (Pl. 56.1 ¶¶ 367-38) In 2002, she returned as a resident in small animal Internal Medicine and was thereafter hired as an Associate Staff Veterinarian. (Id. ¶¶ 368-71) She became Board Certified in Internal Medicine in 2004 and certified in Canine Rehabilitation in 2009. (Id. ¶¶ 369-70) Upon her becoming Board Certified, AMC promoted her to Staff Veterinary Internist. (Id. ¶ 374) Few veterinarians go through the training and testing required to be Board Certified. (Id. ¶ 373)

For years, Board of Trustees members and other major donors insisted on their pets being treated by the then-Chief Executive Officer ("CEO"). (Id. ¶ 390) AMC's next CEO was not a practicing veterinarian and Deena Wolfson ("Wolfosn"), the CEO's assistant, asked Chiaramonte, then a resident, to see some of their pets, because Wolfson had heard such positive reports about Chiaramonte's abilities. (Id. ¶ 390-91) Wolfson observed that Chiaramonte, unlike many other veterinarians, was willing to spend the time these owners required, and was comfortable speaking with them. (Id. ¶ 391) When AMC leaders decided to establish a program to provide specialized primary care for the pets of the key donors and Trustees, a program eventually called the President's Council, Chiaramonte was asked to establish and run the program, with Wolfson assisting her. (Id. ¶¶ 391, 396, 401-02) From the beginning, the goal was, by providing "concierge" service, to develop strong relationships with the owners to generate large donations. (Id. ¶¶ 390, 393, 403, 406-07, 412) Although initially Chiaramonte managed the President's Council in addition to her duties as an internist on Medical Service 1, in 2004 AMC made managing the President's Council her full-time responsibility. (Id. ¶¶ 392, 395)

Chiaramonte saw fewer patients in the President's Council than did doctors in some other practices because the members expected that Chiaramonte would devote her full attention to them and take as much time as necessary to answer all of their questions. (Id. ¶¶ 393, 397) Chiaramonte provided primary care for the pets. (Id. ¶ 396) When pets needed specialty care,

she coordinated the care, and remained involved.  (Id. ¶ 399) Chiaramonte had supervisory and administrative responsibilities for the President's Council.  (Id. ¶ 397) She also had additional responsibilities in marketing and development, including keeping the Development department advised of information relating to donors and potential donors.  (Id. ¶¶ 400, 404)

In 2002, Chiaramonte and Dr. Jason Fusco ("Fusco") recognized the need for a rehabilitation service at AMC.  (Id. ¶ 416) After researching other rehabilitation clinics in the region, they drafted a business plan and presented it to the CEO.  (Id. ¶ 417)  When AMC approved the plan, Chiaramonte and Fusco solicited donations.  (Id.)  In 2004, funded primarily by AMC Board member Tina Flaherty ("Flaherty"), Chiaramonte and Fusco established the Tina Santi Flaherty Rehabilitation and Fitness Service (the "Rehab Center").  (Id. ¶ 418)  Flaherty acknowledged that the Rehab Center was founded in large part due to Chiaramonte's "enthusiasm and commitment."  (Id. ¶ 419)

Chiaramonte and Fusco researched the equipment needed, fee schedules, staffing needs, and modalities to be offered at the Rehab Center.  (Id. ¶ 420)  In 2008, Fusco left, and Chiaramonte became the only doctor and the sole head of the Rehab Center.  (Id. ¶¶ 422, 424) Chiaramonte supervised the day-to-day running of the Rehab Center, including treatments and referrals, and regularly evaluated patients for treatment.  Chiaramonte also had responsibility for raising awareness for the Rehab Center, including networking, public relations, and development. (Id. ¶¶ 424-28)  AMC considered the fledgling service to be a valuable one with no competition in New York City.  (Id. ¶ 430)

Throughout Chiaramonte's employment she received positive feedback about her performance as a veterinarian, including positive performance evaluations.  (Id. ¶¶ 405, 460) In June 2011, AMC touted that the President's Council was "profitable for the AMC by any

measure," with a team of a "dedicated doctor, vet tech and coordinator," ███████ in revenue, and ███████ in member donations.  (Id. ¶¶ 408-09)

AMC Leadership

AMC has a Board of Trustees of approximately 25 members that governs and gives guidance to AMC.  (Id. ¶¶ 375, 378)  The Board has several committees, including the Executive Committee and the Compensation Committee. (Id. ¶ 375) Robert Liberman ("Liberman") has been on the Board since 1997 and its Chair since 2008. (Id. ¶ 376) The Executive Committee has been involved on several occasions when AMC fired veterinarians.  (Id. ¶¶ 381, 383)  During Liberman's tenure on the Board, AMC has had three permanent and two interim CEOs.  (Id. ¶ 384)  Coyne became CEO in early 2010.  (Id. ¶ 480) She has no employment contract. (Id. ¶ 388)

Barron's Hiring

In spring 2010, after Coyne joined AMC, Wolfson announced that she would be retiring. (Id. ¶ 482) At AMC's request, Wolfson agreed to delay her retirement until late summer 2010. (Id. ¶ 485)  Wolfson and Coyne discussed Wolfson's replacement.  Wolfson prepared a description of her job, which was later compiled into a list of qualifications and responsibilities. (Id. ¶ 483)  Among the qualifications were "B.S. degree or experience in practice management . . . Basic (or higher) understanding of veterinary medicine . . . Must have knowledge of computer, telephone systems and all basic office equipment." (Id. ¶ 484)

In June 2010, Coyne recommended hiring her sister, Margaret Barron  ("Barron"), on a temporary basis until AMC hired a replacement for Wolfson.  (Id. ¶ 485)  At the time, Barron had not held a full-time job since 1987, had never worked in a veterinary office, and was not familiar with modern office software and equipment.  (Id. ¶¶ 487-89)  While Coyne claimed that Barron was qualified because she had experience working for a "large dental practice" and "experience with animals" (Id. ¶ 486), Barron worked for a dental practice with one dentist from 1971 to 1981 and her experience with animals was primarily as a pet owner.  (Id. ¶¶ 487, 491)

The resume Barron submitted to AMC falsely stated she had a B.S.  (Id. ¶¶ 506-08)  Barron's resume listed her involvement with various animal welfare organizations, although her involvement was mostly as donor and golf tournament participant. (Id. ¶ 492)

AMC typically performs background checks when hiring employees, even relatives of existing employees, but did not do so when hiring Barron.  (Id. ¶¶ 495-97)  AMC had a policy against hiring relatives of existing employees when there will be any reporting relationship.  (Id. ¶ 498)  When Board member Elaine Langone ("Langone") heard about the hiring of Barron, she expressed concern, as it appeared to be a conflict of interest.  (Id. ¶ 501)  After Barron began working at AMC, Chiaramonte and several other employees met with Coyne to express concern about the hiring of Barron.  (Id. ¶ 499)  They had concerns about Barron's qualifications and were worried that Barron would be spying on them for Coyne.  (Id. ¶ 500) Coyne agreed to remove Barron from the President's Council, but then did not search for a replacement for Wolfson. (Id. ¶ 503)

With Wolfson's retirement imminent, Chiaramonte and others agreed that having Barron work temporarily was better than having the position unfilled.  (Id. ¶ 504) Barron returned to AMC in mid-July 2010.  (Id. ¶ 505) Barron shadowed Wolfson for about three weeks.  (Id. ¶ 488) Wolfson focused mainly on trying to teach Barron the computer system; although Barron took many notes, she did not seem to be catching on.  (Id.)  Wolfson introduced Barron to President Council members as her temporary replacement.  Coyne told Wolfson that she should stop referring to Barron as "temporary," claiming it would make the members nervous. (Id.)

Chiaramonte was on maternity leave from August to October 2010, and worked part-time from October 2010 to January 2011.  (Id. ¶ 509) In the fall of 2010, while Chiaramonte was on maternity leave, Coyne made Barron a permanent employee, without consulting Chiaramonte.  (Id. ¶¶ 510-11) Coyne simply informed Human Resources ("HR") of Barron's new status, salary,

hours, and responsibilities. (<u>Id</u>. ¶ 511-12) Coyne allowed Barron to work only four days per week although the Presidents Council was open Monday through Friday. (<u>Id</u>. ¶ 512) Coyne granted her sister free parking. (<u>Id</u>. ¶ 513-14) During the week, Barron lived with Coyne in her AMC-provided apartment. (<u>Id</u>. ¶ 515)

<u>Barron's Performance</u>

When Chiaramonte returned from maternity leave, pet owners and several doctors complainted to her about Barron's performance. (<u>Id</u>. ¶¶ 516-20) Chiaramonte spoke with Coyne about AMC providing Barron additional training, including rotating her through several departments, but Coyne never followed through. (<u>Id</u>. ¶¶ 521-23)

In late November 2010, Chiaramonte was instructed to complete a probationary evaluation for Barron. (<u>Id</u>. ¶ 525) Because Chiaramonte had been on maternity leave for much of Barron's employment, Chiaramonte did not evaluate all aspects of Barron's employment, and explained why. (<u>Id</u>. ¶526) Chiaramonte criticized some aspects of Barron's performance. (<u>Id</u>. ¶¶ 530-31) Although Coyne did not review employees' evaluations, she asked to see a copy of Barron's probationary review. (<u>Id</u>. ¶¶ 535-37) Coyne directed HR Director Linda Faison ("Faison") to hold Barron's evaluation and asked repeated questions about the review and other reviews by Chiaramonte before allowing the review to be given to Barron. (<u>Id</u>. ¶¶ 538, 541)

At AMC, reviews were typically done annually on the anniversary of the employee's hiring. (<u>Id</u>. ¶ 545) In summer 2011, Chiaramonte was due to give Barron her first annual review. (<u>Id</u>. ¶ 546) There was some delay in completing the review, because of a new template, and the review was not completed until later in the year. (<u>Id</u>. ¶ 553) Because Chiaramonte knew that Coyne had been unhappy with Chiaramonte's first review of Barron, Coyne reviewed her draft with Faison. (<u>Id</u>. ¶¶ 544, 547) Faison suggested that Chiaramonte provide examples for the areas in which she was critical of Barron. (<u>Id</u>. ¶ 548) Chiaramonte was concerned about drafting the review and tried to couch her criticism in the softest language possible. (<u>Id</u>. ¶ 549) Although she

rated Barron "meets expectations," she nevertheless criticized some aspects of Barron's performance. (Id. ¶¶ 551-52)

Again, Coyne asked to see a copy of Barron's review. (Id. ¶ 554) In January 2012, Chief of Medicine Richard Goldstein ("Goldstein") also asked Chiaramonte to see a draft of the review. (Id. ¶ 555) Chiaramonte shared with him her concerns about criticizing Barron; he offered to join the review meeting. (Id. ¶ 556) On January 17, 2012, Coyne sent Goldstein an email stating, "I reviewed the evaluation for Margaret. Overall I think it is accurate, although, there are a few glaring inaccuracies that Dee [Chiaramonte] needs to address . . . [D]ee should not schedule the evaluation date with her and you until we get a chance to speak." (Id. ¶ 557) Although Chiaramonte followed up with Goldstein, she was never permitted to give Barron the 2011 evaluation, and HR has no review for her for that year. (Id. ¶¶ 558-59, 561)

Coyne and Barron Conspired Against Chiaramonte

Beginning in winter 2010, Barron secretly informed Coyne whenever she was displeased with Chiaramonte. (Id. ¶ 565) Barron frequently blind-copied Coyne or forwarded to her communications with Chiaramonte about work. (Id. ¶¶ 566, 568-69, 571, 573, 575) Neither Barron nor Coyne could provide a justification for the blind-copying. (Id. ¶¶ 567, 574) At one point, Barron forwarded to Coyne an email in which Chiaramonte questioned why Barron had scheduled an appointment for a patient with a doctor who no longer worked at AMC. (Id. ¶ 571) After Coyne suggested how Barron should deal with it, Barron wrote, "I will always need your help and guidance! That is the price you pay for being my big sister!" (Id. ¶ 572) Despite the flurry of secret communication between sisters, Coyne claimed that she did not focus on the Council because it was only one of "a huge amount of projects" she was handling. (Id. ¶ 576)

After Chiaramonte opposed hiring Barron, Coyne also began to seek ammunition against Chiaramonte. (Id. ¶ 577) In October 2010, Coyne asked Faison for a job description for Chiaramonte and all her past reviews. (Id. ¶ 578) Coyne had not reviewed the evaluations for

any doctor other than Chiaramonte. (Id. ¶ 579) Coyne also began "documenting" incidents of alleged inappropriate behavior by Chiaramonte, some of which Coyne clams to have personally witnessed. (Id. ¶¶ 581-84, 593-96, 599-601, 606-09, 618-20) Other than one joking comment referring to a line from a movie, Chiaramonte did not engage in any of conduct set out in Coyne's secret file. (Id. ¶¶ 583, 597, 604, 611, 623-24) Although AMC policy requires managers with knowledge of any incident of possible sexual harassment to report it to HR, Coyne did not tell HR of any of the incidents in her file. (Id. ¶¶ 585-88) Nor did Coyne ask Chiaramonte about any of them, or counsel her about her purported behavior. (Id. ¶¶ 590-91, 606, 611, 625)

Rehab Center Reports

In February 2012, Chiaramonte, Coyne, Goldstein, Liberman, Development Director Courtney Rabb ("Rabb") and Flaherty met to discuss the need to expand the Rehab Center. (Id. ¶¶ 434, 436) Among other things, they discussed the need to hire more staff, something Chiaramonte favored. (Id. ¶¶ 437-38) In early 2012, Chiaramonte hired Dr. Leilani Alvarez ("Alvarez"), the first doctor hired to work full-time in the Rehab Center. (Id. ¶ 439) Because Alvarez was hired shortly before taking maternity leave, Chiaramonte discussed with her that it made sense to delay any changes in how the Center was run until Alvarez's return from maternity leave. (Id. ¶¶ 440, 453)

In connection with discussions for expansion, Flaherty requested that the Rehab Center be evaluated by outside consultants so that it could become the best rehabilitation service in the country. (Id. ¶¶ 441-42) Chiaramonte, Goldstein and others selected two consultants, Dr. James Gaynor ("Gaynor") and Dr. Laurie McCauley ("McCauley"). (Id. ¶ 443) Everyone involved expected that the reports would identify ways in which the Center could improve. (Id. ¶ 444)

On May 8, 2012, Gaynor emailed his report to Chiaramonte. (Id. ¶ 446) The Gaynor Report identified the strengths of the Rehab Center, including "Consistent team which works well together; Consistent care; Client trust; Self sufficient team; Talented staff; good relationship

with some aspect of the surgery service; Flexible, easy coordinating; good follow-up to referring veterinarians." (Id. ¶ 447) To address the weaknesses identified, the Gaynor report recommended hiring a full-time doctor, a role Alvarez would be filling upon her return from maternity leave. (Id. ¶¶ 449-50) Chiaramonte agreed with most of the Gaynor Report's recommendations, except about the purchase of one piece of equipment. (Id. ¶ 452)

In early June 2012, after Coyne was close to finalizing her decision to fire Chiaramonte, McCauley visited AMC. (Id. ¶¶ 625-27) Although Chiaramonte coordinated McCauley's visit and communicated with her before and during her visit, McCauley emailed her report to Coyne. (Id. ¶¶ 629-30) The first half of the report contained summaries of interviews of staff affiliated with the Rehab Center. (Id. ¶ 630) The report did not include any summary of an interview with Chiaramonte, who ran the Center. (Id.) Alvarez, who was still on leave, asked to meet with McCauley. (Id. ¶ 633) McCauley devoted a substantial part of the report to her discussion with Alvarez. While McCauley set out what Alvarez claimed were differences between Alvarez and Chiaramonte, McCauley's Report contains nothing suggesting she asked Chiaramonte or other staff to comment on Alvarez's statements. (Id. ¶¶ 634-35, 639) McCauley also included Alvarez's accusation that Chiaramonte had referred to her as a "bitch" when speaking to a staff member; neither McCauley, nor Coyne after she got the report, asked Chiaramonte or the staff member if it was true or asked HR to investigate. (Id. ¶¶ 636, 639, 641) The accusation is false. (Id. ¶ 642) When Faison heard about the accusation just before Coyne fired Chiaramonte, Coyne falsely assured Faison that she had corroboration and that the "staff heard it." (Id. ¶ 640) Coyne emailed Goldstein that the McCauley Report was "deadly." (Id. ¶644)

Goldstein Report

Between May and July 2012, Coyne asked Goldstein to prepare a report about Chiaramonte's patient care, although Goldstein had not supervised Chiaramonte long and they had little interaction. (Id. ¶¶ 646-48) The report contained three "examples" of alleged "medical

errors." (Id. ¶ 651) Coyne provided all three examples to Goldstein. (Id. ¶ 653) Goldstein was not employed by AMC when two of the incidents occurred. (Id. ¶¶ 665, 676) One incident involved a mass missed on a cat's X-ray that was discovered in March 2011; at the time, all involved blamed a doctor other than Chiaramonte for the error. (Id. ¶¶ 664-65) Another was, at most, a communication error involving treatment for a cat with kidney disease that occurred in October 2011. (Id. ¶¶ 666-76) Chiaramonte had never been spoken to for either incident. (Id. ¶ 686, 676) For the third incident, involving an elevated white blood count, prior to this report there is no evidence anyone blamed Chiaramonte for any aspect of the dog's care. (Id. ¶¶ 677-82)

Before Goldstein submitted a final copy of the report, he sent a draft to Coyne on July 3, 2012, to "make sure" it aligned with Coyne's "intention" and addressed the issues "she wanted [him] to address." (Id. ¶ 684) He said he was "happy to keep working on it." (Id. ¶ 685) In September 2014, long after this case was filed, Coyne asked Goldstein to add a "date, title and signature" to the report for unspecified reasons. (Id. ¶ 697) Numerous veterinarians had complaints against them, yet were not fired, including doctors who gave a pet a fatal overdose of chemotherapy and inappropriately treated an animal under anesthesia. (Id. ¶¶ 693-96)

### Coyne Fired Chiaramonte After Getting Board Support

In July 2012, Chiaramonte was due to give Barron her next annual review. (Id. ¶ 562) At around the same time, Coyne met with Liberman and told him that she wanted to fire Chiaramonte because she had made three medical errors, had mismanaged the Rehab Center and had "years of behavioral transgressions." (Id. ¶¶ 725-26) If Liberman thought that Coyne wanted to fired Chiaramonte to protect her sister, he and other Board members would have objected. (Id. ¶ 727) Coyne and Liberman then set up meetings with other key Board members. (Id. ¶ 728) Coyne told the Executive Committee that she was firing Chiaramonte because of unprofessional behavior and issues with medical judgment and follow-through. (Id. ¶¶ 731-33)

Coyne prepared at last two detailed memoranda in advance of her meetings with Langone and Nancy Kissinger ("Kissinger") to provide to each of them. (Id. ¶¶ 734-35)  The memoranda contained detailed, false accusations about Chiaramonte's medical care, her management of the Rehab Center, her productivity, alleged falsification of her time records, and inappropriate behavior, including "numerous racial remarks" about AMC employees. (Id. ¶¶ 736-38)  The memoranda referenced, and attached as exhibits, the McCauley and Goldstein Reports, but did not attach the Gaynor Report or describe its overall positive view.  (Id. ¶¶ 447, 737-38)

When Coyne met with Langone and Kissinger, she told them the same justifications for firing Chiaramonte she had told Liberman.  (Id. ¶¶ 739-41, 743-44)  Upon hearing Coyne's explanation, Langone and Kissinger agreed with the decision. (Id. ¶¶ 742, 745) Coyne then met with Flaherty, who was upset when Coyne said she wanted to fire Chiaramonte. (Id. ¶¶ 746-47) Coyne provided her the same reasons, and gave her a copy of the Kissinger memoranda.  (Id. ¶¶ 747-48) Flaherty eventually agreed to fire Chiaramonte.  (Id. ¶ 749)

Coyne fired Chiaramonte on July 24, 2012.  (Id. ¶¶ 766-67) After she did so, Coyne told Faison, who is African-American, that Chiaramonte had referred to her as "blackie."  (Id. ¶ 753) Faison could not understand why Coyne was telling her this.  (Id. ¶¶ 754, 758)  After questioning Coyne, she understood that Coyne wanted her to be concerned because the racial comment "demonstrated [Chiaramonte's] character as a person." (Id. ¶755)    Faison never heard Chiaramonte use such language or been told she had done so.  (Id. ¶ 760; see ¶¶ 761-62)

After AMC fired Chiaramonte, she was replaced on the President's Council by a team of seven doctors, primarily Internal Medicine specialists.  (Id. ¶¶ 159, 414, 810, 835)  President's Council then began reporting to the Development department, in recognition of its importance to fundraising.  (Id. ¶415)  Alvarez was appointed head of the Rehab Center.  (Id. ¶ 456)

<u>Unequal Pay</u>

Chiaramonte was paid less than male department heads who performed substantially equal work, as well as Douglas Palma ("Palma"), who was Board Certified in Internal Medicine a year after Chiaramonte. (<u>Id</u>. ¶¶ 779, 784-824) AMC also paid female doctors less than it did male doctors performing substantially equal work; with the exception of areas staffed solely by female veterinarians, a man was the highest paid doctor in every department for which AMC provided salary information. (<u>Id</u>. ¶¶ 825-61) AMC's witnesses gave conflicting testimony about how a variety of factors were used to set the salaries. (<u>Id</u>. ¶¶ 781-82, 844-46, 848, 854-56, 861)

<u>ARGUMENT</u>

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where the movant demonstrates no issues of material fact. <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014). When deciding a summary judgment motion, a court must "construe the evidence in the light most favorable to the non-moving party." <u>DeRosa v. Nat'l Envelope Corp.</u>, 595 F.3d 99, 102 (2d Cir. 2010). "In determining whether . . . there is . . . a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." <u>Kaytor v. Elec. Boat Corp.</u>, 609 F.3d 537, 545 (2d Cir. 2010) (internal quotations and citations omitted). A court may not credit the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached. <u>Reeves v. Sanderson Plumbing Prods, Inc.</u>, 530 U.S. 133, 151 (2000); <u>see</u> <u>In re Dana Corp.</u>, 574 F.3d 129, 152-53 (2d Cir. 2009) (error to rely on testimony of interested witness for summary judgment).

## II.  PLAINTIFF'S DEFAMATION CLAIM SHOULD NOT BE DISMISSED

A reasonable jury could find that plaintiff has met all of the elements of slander or libel. Under New York law, slander consists of "(i) a defamatory statement of fact, (ii) that is false,

(iii) published to a third party,[2] (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by a privilege."  Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001).[3] Defendants challenge only whether the statements made were true, whether they were factual and whether they were privileged (Def. Br. 11-24), but do not meet their burden of proving any of those points as a matter of law.

Defendants also argue in a footnote that because plaintiff alleged only slander in the complaint, she can rely only upon spoken statements.  (Def. Br. 12 n.4). While the case defendants cite, Colodney v. Continuum Health Partners, Inc., No. 03 Civ. 7276 (DLC), 2004 WL 829158, at *7 (S.D.N.Y. Apr. 15, 2004), does correctly state that slander is spoken words, libel written ones, it does not say anything about limiting the inquiry.  Indeed, the case refers to the "'twin torts of libel and slander.'"  Id. (quoting Albert, 239 F.3d at 265).  Late in the discovery process, defendants produced two memoranda containing several defamatory statements about plaintiff.  (Declaration of Anne L. Clark ¶¶ 56-57, Exs. 55-56)  As the standard for libel is essentially the same as the standard for slander, cf. Pisani v. Staten Island Univ. Hosp., No. 06-CV-1016 (JFB)(MLO), 2008 WL 1771922, at *9 (E.D.N.Y. Apr. 15, 2008), and defendants knew of their own memoranda, the evidence should be considered part of plaintiff's defamation claim.  See Fed. R. Civ. P. 15(b)(1).

A. Coyne's Statements Were False

There is substantial evidence which would permit a jury to find that Coyne's statements

---

[2]  While Coyne denied actually giving the memoranda to the addressees, Langone, prior to a break with counsel, testified she received the memoranda addressed to her. (Pl. 56.1 ¶ 741)  Coyne admitted providing the memoranda to Flaherty. (Pl. 56.1 ¶ 749)  A jury is entitled to disbelieve Coyne that she did not provide the memorandum to Kissinger and did not attach the exhibits referenced in the memoranda.  Reeves, 530 U.S. at 151.

[3]  Albert is controlling and directly on point for a number of issues concerning plaintiff's defamation and tortious interference claims.  (See infra at 15-17, 19-22)  While defendants clearly know of the case and its relevance (see Def. Ex. 3 at 3), they do not cite it once in their brief.

about Chiaramonte were false.[4]  Other than one comment that plaintiff testified was a joking reference to a line from a movie (Pl. 56.1 ¶ 583), plaintiff did not make any of the racist, sexual, or otherwise inappropriate comments.  (Id. ¶¶ 598, 604, 611, 621, 641, 760-62)  Even if Coyne's assistant had told her that Chiaramonte once called Faison "blackie," which she did not,  a jury is entitled to disbelieve that assertion. Coyne, however,  portrayed to key Board members that plaintiff had made "numerous racial remarks" about other AMC employees."  (Id. ¶¶ 750-51)

Coyne directed Goldstein to draft a report disparaging Chiaramonte's medical abilities, provided him with the three examples to include, and falsely represented to Board members that Goldstein conducted an independent assessment of Chiaramonte's medical skills based on his first hand observations from his "day-to-day" interactions with her and his review of files.   (Id. ¶¶ 646, 653, 737-38)  Goldstein, however, had limited interaction with Chiaramonte during the few months he supervised her, he was not even employed by AMC when two of the three "medical errors" occurred, the report falsely portrays what occurred with each incident, and Goldstein's goal was clearly to do Coyne's bidding in drafting the report.  (Id. ¶¶ 647-48, 654-84)

With regard to the Rehab Center, Coyne presented the McCauley Report in a false light, failing to explain to Board members that it was based primarily on statements by Alvarez, who had worked only briefly for AMC before going out on maternity leave; she also failed to disclose that no one had asked Chiaramonte or any other Center staff about the truth of those statements. (Id.  ¶¶ 630-36,  638-42,  737-38)     Significantly,  Coyne did not describe or share the overwhelmingly positive Gaynor Report.   (Id. ¶¶ 447-50, 737(c))   Coyne also falsely told Trustees that Chiaramonte had "little or no involvement in the day-today operation" of the Rehab Center and that there had been no "research, expansion of the program, educational advancement

---

[4] Defendants rely on a series of allegations from their 56.1 Statement.  (Def. Br. 24, citing Def. 56.1 ¶¶ 93-127, 256-307, 345-48)  However, plaintiff denies in whole or in significant part most of those paragraphs, including all with the most material facts.  See Pl. 56.1 ¶¶  97-98, 101-04, 106-12, 115, 118-24, 127, 258-62, 264-70, 272-76, 278-80, 282-88, 290-98, 300, 302, 304-07, 345-48.

of the technicians, training or integration with the rest of AMC." (Id. ¶¶ 424-29, 737(c))

Coyne also lied to the Board about Chiaramonte's productivity, both by providing false numbers and by mis-portraying the significance of productivity for the President's Council. (Id. ¶¶ 403, 409, 698-708, 737(d), 738) In addition, Coyne falsely accused Chiaramonte of falsifying her time records. (Id. ¶¶ 708-10, 737(e))

There are numerous factual issues about the truth or falsity of Coyne's statements that must be resolved by a jury.

### B. Coyne Made Statements of Fact

This case is not, as defendants argue (Def. Br. 20-21), a mere disagreement about Coyne's opinion of Chiaramonte's performance. Indeed, this case bears striking similarity to Albert. If Coyne's statements about Chiaramonte engaging in unprofessional conduct, displaying poor medical judgment and mismanaging the Rehab Center were references to things Chiaramonte "in fact had done," the statements "might very well have been incapable of supporting an action for slander."[5] See Albert, 239 F.3d at 268. However, as in Albert, Coyne did more than express opinion, and made specific factual allegations:

> Those accusations are more than statements of opinion about [plaintiff's] work performance, they are specific statements of fact – statements capable of objective proof – about what [plaintiff] did and did not do. And the statements were all made in the context of [the supervisor] seeking the summary termination of [plaintiff], which virtually eliminates the possibility that they were meant as rhetorical hyperbole. The statements thus heavily laden with assertions of fact were capable of a defamatory meaning sufficient to sustain a defamation recovery.

Id.

---

[5] Most of the cases cited by defendants (Def. Br. 20-21) contain just general characterizations, without specific factual accusations. See Brattis v. Rainbow Adver. Holdings, LLC, No. 99 Civ. 10144 (NRB), 2000 WL 702921, at * 4 (S.D.N.Y. May 31, 2000); Gavenda v. Orleans Cnty., No. 95-CV-0251E(Sc), 1997 WL 65870, at *8 (W.D.N.Y. Feb. 10, 1997); Aaronson v. Wiersma, 65 N.Y.2d 592, 594 (1985); Kim v. Dvorak, 230 A.D.2d 286, 291 (3d Dep't 1997); Armodei v. New York State Chiropractic Ass'n, 160 A.D.2d 279, 281 (1st Dep't 1990); Williams v. Varig Brazilian Airlines, 169 A.D.2d 434, 437 (1st Dep't 1991); Hollander v. Cayton, 145 A.D.2d 605, 606 (2d Dept' 1988). The other cited cases are in very different contexts. See Brian v. Richardson, 87 N.Y.2d 46, 53 (1995) (op-ed column would be understood as describing allegations, not facts); Steinhilber v. Alphonse, 68 N.Y.2d 283, 293 (1986) (recording was intended to be "invective expressed in the form of heavy-handed and nonsensical humor").

Indeed, this case is stronger than <u>Albert</u>.  Coyne not only made "specific statements of fact" which were false, she provided what she described as independent "reports" <u>of</u> <u>fact</u> knowing they were not, and excluding from review another report.  Coyne's conduct with respect to the reports makes it abundantly clear why defendants no longer even mention <u>Albert</u> in this submission, although previously recognizing its relation to this case.

### C.  <u>Coyne's Statements Were Not Privileged</u>

While plaintiff agrees with defendants that a qualified privilege can apply to certain employment-related communications, defendants misapply the doctrine and distort the facts.

With regard to Coyne telling Faison that Chiaramonte had referred to her as "blackie," the privilege does not apply.  If Coyne had reported to Faison any of the comments she kept in her secret file at the times they supposedly occurred (Pl. 56.1 ¶¶ 581, 592-93, 607-08), the privilege, if not abused, would be available, because Coyne would have been sharing information with HR that falls within its area of responsibility.  Coyne did not do so.  Instead, after Chiaramonte was already fired, Coyne told Faison about a comment Faison had never heard or heard anything about.  (<u>Id</u>. ¶¶ 753, 760)  Faison herself could not figure out why Coyne was telling her about the "blackie" comment, and asked about it repeatedly to try to figure out Coyne's motive.  (<u>Id</u>. ¶¶ 754, 756, 758)  Faison concluded that Coyne was trying to warn her of Chiaramonte's bad character.  (<u>Id</u>. ¶ 755)  Such a purpose does not fit within the type of "common interest" that should be protected.

Moreover, Coyne forfeited the qualified privilege for all the defamatory comments because she made them with "malice," of both the "common-law" and "constitutional variety." <u>See</u> <u>Albert</u>, 239 F.3d at 272; <u>Herlihy v. Metro. Museum of Art</u>, 214 A.D.2d 250, 259 (1st Dep't 1995).

"Common-law malice 'mean[s] spite or ill will,'  . . . and defeats the privilege only it if is 'the one and only cause for the publication.'"  <u>Albert</u>, 239 F.3d at 272 (citations omitted).  Coyne

was very close with her sister, sharing her AMC apartment with her after Barron was hired.  (Pl. 56.1 ¶ 515)   After Chiaramonte opposed hiring Barron, Coyne began keeping a secret file on Chiaramonte.  (Id. ¶¶ 581-621)   Coyne and Barron communicated behind Chiaramonte's back about Chiaramonte's interactions with Barron.  (Id. ¶¶ 565-75) Although Coyne did not review the evaluations of other staff, she took an excessive interest in Chiaramonte's reviews of Barron, and reacted strongly to the criticisms Chiaramonte made about Barron's performance.  (Id. ¶¶ 535-38, 541, 554, 557-59)   Indeed, Coyne never let Chiaramonte give Barron her first full review because Coyne did not like the contents.  (Id. ¶¶ 557-59, 561)  Chiaramonte was due to give Barron her next review when Chiaramonte was fired.  (Id. ¶¶ 562, 766-67)  See Albert, 239 F.3d at 272 (supervisor had motive to defame plaintiff to prevent plaintiff from revealing unsafe conditions at the hospital and the supervisor's moonlighting during work hours, sometimes with hospital equipment).

While Coyne had the legal authority to fire Chiaramonte, Coyne knew that many Board members were very close with Chiaramonte and that Chiaramonte cared for their beloved pets. (Pl. 56.1 ¶¶ 393, 419, 728-30)   The Board's Executive Committee had been involved in the termination of other doctors, and had fired or pushed out CEOs who preceded Coyne.  (Id. ¶¶ 381, 383, 385-87)  Coyne herself was an employee-at-will.  (Id. ¶ 388)  Liberman testified that if he thought Coyne wanted to fire Chiaramonte to protect her sister he and other Board members would have opposed it.  (Id. ¶ 727)  A jury could certainly disbelieve Coyne's self-serving statement that had the Board opposed Chiaramonte firing she would have quit.  (Id. ¶ 307) Given the lengths Coyne went to – assigning Goldstein to draft a report based on alleged medical issues she provided to him, meeting with Liberman, drafting detailed memoranda with

exhibits,[6] and meeting in advance with key Board members (Id. ¶¶ 646, 651, 725-49) – a jury could conclude that Coyne knew she needed the support of the Board to fire the President's Council veterinarian, and spun a web of lies to obtain the necessary support.

Coyne's conduct also satisfies the standard for "actual malice," because she made "false statements with knowledge of their falsity . . . or 'with [a] high degree of awareness of [the publication's] probable falsity,' or while" Coyne "entertained serious doubts as to the truth of [the publication]." Albert, 239 F.3d at 273 (citations omitted, alterations in original).

Coyne claimed that she witnessed first-hand comments she attributes to Chiaramonte that Chiaramonte did not make. (Pl. 56.1 ¶¶ 595, 619) Contrary to defendants' argument (Def. Br. 17), this could be no "honest mistake," and constitutes malice. See Herlihy, 214 A.D.2d at 260. For the inappropriate comments Coyne claims were reported to her (Pl. 56.1 ¶¶ 584, 600, 759), not only could a jury disbelieve that most were reported to her, but that, even if they were, find that Coyne at least entertained serious doubts about them. If Coyne really believed any of the reports, she would have followed AMC policy and reported them to HR for investigation and, if appropriate, disciplinary action. (Id. ¶¶ 585-89) Coyne did not do so, nor did Coyne ask Chiaramonte if there was any truth to the reports or counsel her that her behavior was unacceptable.[7] (Id. ¶¶ 589-90, 605, 610, 624)

Coyne knew that she was not qualified to assess whether Chiaramonte provided proper medical care, yet directed Goldstein to write up specific incidents, two of which occurred before his tenure. (Id. ¶¶ 646, 652-53, 665, 676) Coyne knew that Chiaramonte was not at fault with respect to the incidents and no action was taken against Chiaramonte regarding them until she

---

[6] A jury could disbelieve that Coyne had Goldstein go to the trouble of drafting a report that was based on information supplied by Coyne (Pl. 56.1 ¶¶ 646, 651, 653) and then did not actually attach it as an exhibit to her memoranda to Trustees, as Coyne claims (Def. 56.1 ¶ 314).

[7] In contrast, when there were reports about other doctors' conduct, HR was involved in investigating and counseling the doctors. (Pl. 56.1 ¶¶ 586-88)

was fired, long after the incidents occurred. (Id. ¶¶ 654-82) See Meloff v. New York Life Ins. Co., 240 F.3d 138, 146-47 (2d Cir. 2001) (jury could find actual malice where supervisor told plaintiff issue was "no problem" yet a week later sent out email accusing her of defrauding the employer). Coyne quashed the more favorable Gaynor Report about the Rehab Center and lied about Chiaramonte's role and contributions to the Center. (Pl. 56.1 ¶¶ 737-38) Coyne also provided productivity numbers lower than what AMC records show, and misrepresented the importance of productivity in the President's Council. (Id. ¶¶ 403, 409, 697-707, 737(d))

Coyne's conduct thus satisfies common-law and actual malice, defeating the privilege.[8]

### III. COYNE TORTIOUSLY INTERFERED WITH PLAINTIFF'S PROSPECTIVE BUSINESS RELATIONSHIP

The evidence relating to plaintiff's defamation claim also supports her claim for tortious interference with prospective business relationship. An employee-at-will can prevail if she demonstrates that a "third party used wrongful means to effect the termination [of her employment] such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice.'" Albert, 239 F.3d at 274 (citations omitted).

### A. Coyne Was a Third Party to Plaintiff's Relationship to AMC

A co-employee such as Coyne is considered a third party to the employment relationship if she acted "outside the scope of her authority" or acted out of malice or self-interest. Id. at 275; Farrell v. Hellen, 367 F. Supp. 2d 491, 505 (S.D.N.Y. 2005). In lying to the Board in order to

---

[8] Defendants' cases (Def. Br. 15-16, 18-19) are inapposite. See Ibraheem v. Wackenhut Servs., Inc., 29 F. Supp. 3d 196, 217-18 (E.D.N.Y. 2014) (no evidence supervisor to whom report was made that plaintiff slept on the job knew the reports were false or was aware they were probably false); Donofrio-Ferrezza v. Nier, No. 04 Civ. 1162 (PKC), 2005 WL 2312477, at *10-11, 13-14 (S.D.N.Y. Sept. 21, 2005) (plaintiff did not show that one defendant had serious doubts of the truth of the statement and admitted that the other defendant never made a threat); Tomasino v. Mount Sinai Med. Ctr. & Hosp., No. 97 Civ. 5252 (TPG), 2003 WL 1193726, at *16-17 (S.D.N.Y. Mar. 13, 2003) (no evidence statements made were not either made in good faith or were innocent mistake); Micalizzi v. Ciamarra, 206 F. Supp. 2d 564, 583 (S.D.N.Y. 2002) (no evidence that statement police officer made in the midst of investigation was made with malice); Liberman v. Gelstein, 80 N.Y.2d 429, 438-39 (1992) (plaintiff failed to demonstrate that defendant did not have source for allegation or show that purpose of making statement was to harm plaintiff); Grier v. Johnson, 232 A.D.2d 846, 848 (3d Dep't 1996) (plaintiff did not submit admissible evidence of malice).

fire Chiaramonte, a respected veterinarian, to protect her sister, Coyne's conduct meets this standard.  See Albert, 239 F.3d at 276 (jury could find supervisor was third-party because he acted purely out of self-interest and undermined the employer's interest by defaming plaintiff to prevent plaintiff from reporting supervisor's misconduct); Friedman v. Wahrsager, 848 F. Supp. 2d 278, 298 (E.D.N.Y. 2012) (corporate officers who acted in their own interest and contrary to the company's were third-parties to the relationship); Farrell, 367 F. Supp. 2d at 505-06 (summary judgment denied based on evidence the union officials acted in their self-interest to retain their positions in the face of a challenge from dissidents and without regard to the welfare of the union); Cohen v. Davis, 926 F. Supp. 399, 405 (S.D.N.Y. 1996) (plaintiff satisfied third party element by claiming doctors caused her to be fired to serve their own self-interests because they wanted to prevent her from revealing financial improprieties and used fraudulent means to cause her firing).

B.    Coyne Used Improper Means

Coyne's defamatory statements, made with malice (see Section II.C., supra), constitute improper means.  See Albert, 239 F.3d at 276 (same evidence that creates issues of fact on defamation claim satisfies tortious interference requirement); Shah v. Lumiere, No. 13 Civ 2975 (LGS), 2013 WL 6283585, at *2 (S.D.N.Y. Dec. 3, 2013) (false statements made to employer designed to cause plaintiff's firing constitutes tortious interference); Hofmann v. Dist. Council 37, No. 99 Civ. 8636 (KMW)(JCF), 2004 WL 1936242, at *5 (S.D.N.Y. Aug. 31, 2004) (false criticism of plaintiffs' performance resulting in their firing constitutes wrongful means); Cohen, 926 F. Supp. at 404 (false, misleading reports about plaintiff's performance are wrongful means).

C.    Coyne Acted for the Sole Purpose of Harming Plaintiff

Coyne's actions, taken to protect her sister (see Section II.C., supra), could be viewed by a jury as having been undertaken for the sole purpose of harming plaintiff.  See Heskin v. Insite Adver., Inc., No. 03 Civ. 2598 (GBD)(AJP), 2005 WL 407646, at *26 (S.D.N.Y. Feb. 22, 2005)

(reasonable jury could find defendant acted solely to harm plaintiff's relationship with her employer because plaintiff had spurned defendant's sexual advances); <u>Maillet v. Frontpoint Partners, LLC</u>, No. 02 Civ. 7865 (GBD), 2003 WL 21355218, at *3 (S.D.N.Y. June 10, 2003) (officer may have tortiously interfered if he decided to fire plaintiff to protect and advance his friend). Defendants' argument that if Coyne harmed plaintiff to protect her sister it negates a finding that her sole motivation was to harm plaintiff (Def. Br. 27 n.8), is contrary to the law. As all the cases cited above hold, including <u>Albert</u>, a motive to harm the plaintiff does not mean that the defendant acted on psychotic impulse, with no reason to desire to harm the plaintiff. The intent requirement is satisfied unless Coyne was "motivated by legitimate economic self-interest." <u>See</u> <u>Carvel Corp. v. Noonan</u>, 3 N.Y.3d 182,191 (2004).

### D. Coyne Interfered with the Relationship

As detailed above (<u>see</u> Section II.C., <u>supra</u>), while legally Coyne could have fired Chiaramonte without involving the Board, the political reality is that Coyne could not, and did not, fire her until she convinced key members of the Board that it was the right thing to do.[9]

Plaintiff has therefore adduced sufficient evidence on all elements of her claim.[10]

---

[9] While defendants devote several paragraphs in their 56.1 Statement to communications from Chiaramonte's husband (Def. 56.1 ¶¶ 329-39), nowhere in their brief do they try to explain the relevance of her husband's speculation about her firing. Aside from the documents being hearsay, any information contained in them is based not on her husband's first-hand knowledge, but on marital communications. As Chiaramonte did not authorize her husband to send the communications that she learned of later (Pl. 56.1 ¶¶ 329-39.) and did not herself reveal marital communications, she had not waived her privilege. <u>See</u> <u>Atl. Richfield Co. v. Triad Petroleum, Inc.</u>, 120 F.R.D. 471, 473 (S.D.N.Y. 1988) (movant failed to meet burden of proving the communications concerning business were not confidential marital communications); <u>cf.</u> <u>Engelmann v. Nat'l Broad. Co.</u>, No. 94 Civ. 5616 (MBM)(AJP), 1995 WL 214500, at *4 (S.D.N.Y. Apr. 10, 1995) (plaintiff waived privilege by testifying about marital communications). The 56.1 paragraphs, like another referencing plaintiff's marital difficulties (Def. 56.1 ¶ 365) that is similarly unmentioned in the brief, thus appear to have no purpose other than to cast plaintiff in a negative light to the Court.

[10] The cases cited by defendants that contain any facts (Def. Br. 25-28), differ substantially from this case, and none call into question the binding law in <u>Albert</u>. <u>See</u> <u>Donofrio-Ferrezza</u>, 2005 WL 2312477, at *17 (plaintiff did not allege any independent tort other than failed defamation claim); <u>Markovic v. New York City Sch. Constr. Auth.</u>, No. 99 Civ. 10339 (AGS), 2002 WL 22043, at *11 (S.D.N.Y. Jan. 8, 2002) (clear that statements defendant made were motivated, at least in part, with goal of getting its invoices paid); <u>Swanston v. Pataki</u>, No. 97 Civ. 9406 (MJL)(KTD), 1999 WL 504905, at *8 (S.D.N.Y. July 15, 1999) (petitions to governmental agency were privileged under First Amendment); <u>Allcar Motor Parts Corp. v. Fed.-Mogul Corp.</u>, No. 96 Civ. 4419 (JFK), 1998 WL 671448, at *6 (S.D.N.Y. Sept. 29, 1998) (no evidence defendant acted to inflict injury on plaintiff or that its statements were fraudulent); <u>Rodriguez v. Amer. Friends of Hebrew Univ.</u>, No 96 Civ. 240 (JGK), 1998 WL 146227, at *6, 9-10 (S.D.N.Y. Mar. 25, 1998) (plaintiff's claim was time-barred; plaintiff also failed to assert any malice or improper

## IV. THE COURT SHOULD DRAW AN ADVERSE INFERENCE FROM DEFENDANTS' DESTRUCTION OF EVIDENCE

Defendants intentionally destroyed evidence that is relevant to plaintiff's claims of defamation and tortious interference. Given the circumstances of the destruction, the Court should, at a minimum, draw an adverse inference against defendants.

AMC had a practice of making audio recordings of all meetings of the Board and its Executive Committee. (Pl. 56.1 ¶¶ 862-63) On August 14, 2012, plaintiff's counsel sent a letter to Liberman advising AMC of plaintiff's potential claims. (Id. ¶ 864) On October 9, 2012, the Board held a meeting at which the Board discussed plaintiff's firing. (Id. ¶¶ 865-66) Plaintiff filed her initial Complaint with the Court on July 23, 2013, containing allegations relating to Coyne's communication to Board members about plaintiff. (Docket No. 1)

During Liberman's deposition on January 20, 2015, when plaintiff's counsel learned of the audio recordings, she requested production of the recordings of the Board and Executive Committee meetings. (Pl. 56.1 ¶ 867) After several follow-up requests from plaintiff's counsel from January through April 2015, defendants' counsel finally admitted that the audio recordings had been destroyed in early 2014 for cost-cutting reasons. (Id. ¶¶ 868-71)

The Court has "[t]he right to impose sanctions for spoliation." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), abrogated on other grounds by Chin v. Port Auth. of N.Y. and N.J., 685 F.3d 135, 162 (2d Cir. 2012). The Court may allow, as a sanction against the spoliator, an adverse inference that the destroyed documents would have been helpful to the non-spoliating party. Id. at 469-70. A spoliation inference is available where: (1) relevant evidence is destroyed; (2) with culpability; and (3) when the defendant was under a duty to preserve the evidence. Byrnie v. Town of

---

motive); Krynicki v. Penthouse Media Group, Inc., 368 B.R. 334, 345 (Bankr. S.D.N.Y. 2007) (plaintiff failed to allege that co-employees committed an independent tortious act); Snyder v. Sony Music Entm't, Inc., 252 A.D.2d 294, 299 (1st Dep't 1999) (no evidence of slander or other wrongful means; plaintiff resigned his employment; his employment was put in jeopardy by his own repeated violations of firm policy, not any statements by defendants).

Cromwell, Bd. Of Educ., 243 F.3d 93, 109 (2d Cir. 2001). No showing of bad faith is required for a party to obtain a negative inference charge. Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108, 113 (2d Cir. 2002). The Second Circuit has held that "[i]n borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." Byrnie, 243 F.3d at 107 (quoting Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998)).

Defendants had a duty to preserve audio tapes as of August 2012, when plaintiff's counsel sent the letter, but certainly by July 23, 2013, when this action was initiated. Moreover, defendants destroyed the audio recordings with the requisite state of mind. See Byrnie, 243 F.3d at 109 ("[I]ntentional destruction of documents in the face of a duty to retain those documents is adequate [on summary judgment].").

In addition, the recording of at least the October 2012 meeting is relevant and its destruction prejudicial. Statements made by Coyne to the Board about firing Chiaramonte could provide further evidence of defamation, as well as that Coyne understood she needed the support of the Board for the firing. The memoranda produced late in discovery (Pl. 56.1 ¶¶ 737-38) suggest that Coyne's statements to the full Board would be relevant and helpful. Accordingly, an adverse inference against defendants is appropriate and defendants' unjustifiable destruction of the recordings is a further basis for denial of summary judgment. See Byrnie, 243 F.3d at 107 ("[D]estruction of evidence, in combination with the evidence undermining [its] justification [for the hiring decision] is adequate to defeat summary judgment.").

## V.   PLAINTIFF'S EQUAL PAY CLAIMS SHOULD NOT BE DISMISSED

Plaintiff has adduced sufficient proof that she was paid less than comparable male veterinarians. AMC does not deny that it paid several male veterinarians more than it paid Chiaramonte. Instead, it relies on disputed facts, fails to construe the facts in plaintiff's favor, and ignores the substantial burden it must meet to overcome a plaintiff's prima facie case.

A.     Plaintiff Has Demonstrated that Men Were Paid More for Equal Work

To prove a prima facie case of discrimination under the EPA and Labor Law, a plaintiff need only establish that: 1) the employer pays different wages to employees of the opposite sex; 2) the work performed by those employees is "substantially equal" in the required skill, effort, and responsibility; and 3) the jobs are performed under similar conditions.  Belfi v. Prendergast, 191 F.3d 129, 135  (2d Cir. 1999) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995)).  "A plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are 'substantially equal' in skill, effort and responsibility." Lavin-McEleney v. Marist Coll., 239 F.3d 476, 480 (2d Cir. 2001). "In interpreting [the] key terms of the statute, the broad remedial purpose of the law must be taken into consideration."  29 C.F.R. § 1620.14.   Plaintiff need not prove that defendants were motivated by a discriminatory intent to prevail under the EPA, Lavin-McEleney, 239 F.3d at 483; Tomka, 66 F.3d at 1310,[11] as it "provides strict liability."  Belfi, 191 F.3d at 135.

The question of whether "two positions are 'substantially equivalent' for [EPA] purposes is a question for the jury."  Lavin-McEleny, 239 F.3d at 480; see 29 C.F.R. § 1620.13; Virgona v. Tufenkian Imp.-Exp. Ventures, Inc., No. 05 Civ. 10856 (GEL), 2008 WL 4356219, at *9 (S.D.N.Y. Sept. 23, 2008) (holding that even on "thin" conflicting evidence concerning job responsibilities, summary judgment on question of equal work was inappropriate).

Plaintiff compares herself to men who, like her, were heads of departments and to a veterinarian Board Certified in Internal Medicine.  Chiaramonte built two important AMC departments from the ground up, the President's Council and the Rehab Center.  (Pl. 56.1 ¶¶ 785-

---

[11] Defendant cites two cases that add to the test that plaintiff also demonstrate that "any difference in pay is attributable to sex."  (Def. Br. 5, 9, citing Fisher v. Vassar Coll., 70 F.3d 1420, 1452 (2d Cir. 1995), and Raco v. Gen. Elec., Co., No. 95-CV-0062, 1006 WL 679789, at *2 (N.D.N.Y. Oct 7, 1996))  Such a requirement is not found in other Second Circuit cases such as Lavin-McEleny, 239 F.3d at 480; Tomka, 66 F.3d at 1310; or Belfi, 191 F.3d at 135. Moreover, the text of the EPA sets forth the conditions upon which equal pay is required and then shifts the burden of proof to the employer.  29 U.S.C. § 206(d)(1).

87)  Chiaramonte conducted extensive research to establish the Rehab Center, and has also produced scholarly publications.  (Id. ¶¶ 465, 787)  She provided medical care to patients in the President's Council and Rehab Center that drew upon her advanced knowledge of Internal Medicine and her certification in Canine Rehabilitation.  (Id. ¶¶ 150-51)  In running the departments, she had substantial administrative duties, including supervising technicians and paperwork.  (Id. ¶¶ 397, 424)  Chiaramonte also spent substantial time on development-related matters, not only through her work with the President's Council, but by attending events, and brought in significant donations.  (Id. ¶¶ 400, 404, 428, 720)  The owners of the pets treated by Chiaramonte were devoted to her.  (Id. ¶ 185(e))  Unlike other doctors, Chiaramonte was also available to her patients' owners 24/7.  (Id. ¶¶ 372, 398, 710)

███████████████████  was the head of the Cardiology department and oversaw the AMC Research department.  (Id. ¶ 797)  Because ████ like Chiaramonte, ran two departments, he had a limited caseload and lower production than many other AMC doctors.  (Id. ¶ 798)  He had mixed performance, did little teaching, and was abusive to students.  (Id. ¶ 798)  His compensation was based in part on indirect revenue AMC received as a result of the work done by the Research department.  (Id. ¶ 799)   He also had responsibilities for maintaining relationships with potential donors.  (Id. ¶ 800)

███████████████████  was Chief of the Diagnostic Imaging Service.  (Id. ¶ 803)  He had significant administrative responsibilities and coordinated patient information with other doctors.  (Id. ¶¶ 802-03)  ██████ did not have a large caseload and primarily oversaw a service heavily dependent on technicians.  (Id. ¶ 804)  Because of his minimal clinical duties, AMC did not monitor his production.  (Id. ¶ 805)

███████████████████  who is not Board-Certified, was head of, and only doctor in, the Dermatology department.  (Id. ¶ 806-07)  ██████ primarily performed procedures that

could be performed by technicians, but was valued by AMC in part because of his loyal following of clients.  (Id. ¶¶ 806-07)

█████████████████ was the head of the Neurology department.  (Id. ¶ 813).  He performed treatments with the aid of technicians and assistants certified in neurology; much of his work could be performed by technicians.  (Id. ¶  814; Def. 56.1 ¶   185)

Palma became Board Certified in Internal Medicine a year after Chiaramonte.  (Pl. 56.1 ¶ 810)  After Chiaramonte was fired, he became one of the veterinarians on rotation in the President's Council.  (Id. ¶  414)

Every year AMC prepared compensation reports on its doctors when making compensation decisions.  (Id. ¶ 825)  With the exception of departments staffed solely by female veterinarians, a man was the highest paid doctor in every department for which AMC provided salary information.  (Id. ¶¶ 826-61)

In comparing Chiaramonte to other department heads, it is not determinative that they worked in different departments.  See  29 C.F.R. §  1620.14(c);  Lavin-McEleney, 239 F.3d at 480 (upholding college professor's EPA claim in which she compared herself to male professors in other departments).[12]

The skills for Chiaramonte's position were equal to that of the other doctors, particularly Palma, who Boarded in the same specialty. "Skill includes consideration of such factors as experience, training, education and ability."  29 C.F.R. §  1620.15(a).  Moreover, "[i]f an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the EPA as jobs the performance of which requires equal skill, even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his or her working time as the employee in the other job."  Id.  Thus, because AMC

---

[12] Thus, defendant's arguments (Def. Br. 6-7) as to plaintiff's departments being "unique" are best made to a jury.

insisted that the President's Council veterinarian be Board Certified (Pl. 56.1 ¶ 391), it did not matter if Chiaramonte did not always have to draw upon this advanced training. (Id. ¶ 396)

Defendants do not specifically challenge the effort required by the respective positions. Given the duties carried out by the veterinarians, there is no basis for finding a difference in the physical or mental exertion required for the positions. See 29 C.F.R. § 1620.16(a). Nor do defendants make more than passing reference to "similar working conditions." As the positions had equal surroundings and hazards, the mere fact that the work occured in different departments within AMC does not take the positions outside the flexible standard applied to this part of the test. See 29 C.F.R. § 1620.18(a). Moreover, AMC has presented no evidence that working conditions was a factor used in setting compensation. See id.

"Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). There is sufficient evidence for a jury to find that the level of accountability of Chiaramonte was equal to that of other department heads and, if anything, exceeded that of Palma. Chiaramonte has thus adduced sufficient evidence to preclude summary judgment. See Tomka, 66 F.3d at 1310-11 (it was jury question as to whether job responsibilities were sufficiently different to preclude EPA claim); Downes v. JP Morgan Chase & Co., No. 03 Civ. 8991 (GEL)(MHD), 2006 WL 785278, at *27 (S.D.N.Y. Mar. 21, 2006) (denying summary judgment where comparators' jobs involved projects of greater technical sophistication but plaintiff's role may have been broader); Scelfo v. Aurora Concept Inc., NO. 02 Civ. 7835 (MHD), 2006 WL 336038, at *10-11 (S.D.N.Y. Feb. 10, 2006) (denying summary judgment even though plaintiff admitted her job and that of comparator had different responsibilities).[13]

---

[13] The cases cited by defendants (Def. Br. 5-6, 10) involve different facts. See Forden v. Bristol Myers Squibb, 63 F. App'x 14, 15 (2d Cir. 2003) (unpublished decision, no precedential value; no discussion as to how defendant met its burden of showing the pay differential was based on permissible factors); Chepak v. New York City Health & Hosps. Corp., No. 11-CV-9698 (KBF), 2015 WL 509279, at *10 (S.D.N.Y. Feb. 5, 2015), appeal filed, Docket No.

B.    AMC Cannot Meet Its Burden of Proof on Affirmative Defense

As plaintiff has satisfied her prima facie case, the burden of persuasion shifts to AMC to prove that the pay disparity is justified by one of four affirmative defenses. Tomka, 66 F.3d at 1310. Defendants ignore this burden, and argue only that AMC has "provided legitimate, nondiscriminatory reasons for any pay disparities." (Def. Br. 10) (emphasis added) "Providing" reasons falls far short of proof, especially as AMC's burden "establishing one of the four affirmative defenses is a heavy one." Ryduchowski v. Port Auth. of New York & New Jersey, 203 F.3d 135, 143 (2d Cir. 2000) (internal quotations and citations omitted). Because AMC has the affirmative burden of proof, it "must conclusively establish all essential elements of th[e] defense." Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 300 (4th Cir. 2012). AMC has the burden of persuasion both to show that it based the men's higher salaries on the factors it cites and that those factors are job-related qualifications of the positions in question. Tomka, 66 F.3d at 1312. AMC's "mere assertion" that the higher salaries were based on its claimed factors "is insufficient to meet this burden." Id.

AMC appears to be relying upon the affirmative defense of "a differential based on any factor other than sex." (Def. Br. 10-11) AMC claims it bases compensation on one objective factor, production/revenue generated, and a host of subjective factors. (Def. Br. 10) However, there are factual disputes as to how AMC set salaries. The compensation reports listed

---

15-679 (plaintiff admitted she did not perform 11 out of 15 of the responsibilities of her comparators); E.E.O.C. v. Port Auth. of New York & New Jersey, No. 10 Civ. 7462 (NRB), 2012 WL 1758128, at *1 (S.D.N.Y. May 17, 2012) (no male comparators identified, no comparison of job responsibilities); Drury v. Waterfront Media, Inc., No. 05 Civ. 10646 (JSR), 2007 WL 737486, at *3-4 (S.D.N.Y. Mar. 8, 2007) (although plaintiff and comparators were Vice Presidents, most held positions with entirely different skills and responsibilities; Vice President of Production & Operations was similar enough to Vice President of Customer Serve to be comparable, but defendant proved reason other than sex for pay difference); Conigliaro v. Horace Mann Sch., No. 95 Civ. 3555 (CSH), 2000 WL 45439, at *5-12 (S.D.N.Y. Jan. 19, 2000) (plaintiff admitted that she and her boss performed different tasks); Gerbush v. Hunt Real Estate Corp., 79 F. Supp. 2d 260, 263 (W.D.N.Y. 1999) (plaintiff admitted that managers of other, more viable branches, did more work than she did); Gibson v. Jacob K. Javits Convention Ctr., No. 95 Civ. 9728 (LAP), 1998 WL 132796, at *1-3 (S.D.N.Y. Mar. 23, 1998) (Sales Representative did not perform substantially equal work as Director of Human Resources); Sigmon v. Parker Chapin Flattau & Klimpl, 901 F. Supp. 667, 679 (S.D.N.Y. 1995) (plaintiff's salary was higher than some men with equal experience; one man who made more was given a raise to prevent him from accepting a job offer elsewhere).

information such as revenue generated, an AMC calculation of 25% of the production, the market rate by specialty according to a survey, and the doctors' credentials. (Pl. 56.1 ¶ 825) However, those reports do not state how the factors are applied, and there are no discernable patterns, other than men being paid more than women. (Id. ¶¶ 825-61)

AMC's own witnesses cannot agree as to how compensation decisions were made. (Id. ¶¶ 781-82, 844-46, 848, 854-56, 861) For example, Coyne and Liberman testified that AMC compared doctors within departments, which Goldstein denied. (Id. ¶ 782) Goldstein testified that the year a doctor became Board Certified was a factor; Coyne said it was not. (Id. ¶ 783)

AMC relies heavily on production/revenue, the sole objective factor. (Def. Br. 10-11) As an initial matter, defendants have produced conflicting numbers for plaintiff's production/revenue. (Id. ¶¶ 697-707, 737(d)) Although Goldstein testified that production figures were based on all revenues generated by a doctor's service, even if performed by staff, the compensation reports did not reflect all of the revenue for the President's Council and Rehab Center. (Id. ¶ 697-707) AMC recognized that for doctors running departments, productivity was less important, if a factor at all. (Id. ¶¶ 801, 804-05) Moreover, AMC was aware that the true value of the President's Council was not the revenue generated by the services it provided, but the much larger donations provided by its members. (Id. ¶¶ 403, 407-09) (e.g., ████ in revenue vs. ████ in donations) Finally, in comparing production to compensation in AMC's departments, there is simply no evidence that production can account for the pay disparities. (Id. ¶¶ 825-26, 830, 834, 838-39, 841, 847, 849, 851)

On records with similar factual disputes, judgment has been denied. See Ryduchowski, 203 F.3d at 144 (factual disputes permitted jury finding in plaintiff's favor on defense); Tomka, 66 F.3d at 1312 (defendant neither "particularized how each of [the 'variety of factors'] explains the salary discrepancy" between plaintiff and the comparators "nor demonstrated how any of the

factors are job-related to the positions in question"); <u>Scelfo</u>, 2006 WL 336038, at *14 (triable issues of fact on affirmative defense).

As AMC cannot prove the affirmative defense as a matter of law, there is no reason to reach the issue of pretext.  <u>See</u> <u>Ryduchowski</u>, 203 F.3d at 144.  The factual disputes set forth above, as well as the pattern of pay disparities throughout AMC, raise triable issues as to pretext as well, and summary judgment should be denied.

<u>CONCLUSION</u>

For the foregoing reasons, and the reasons set forth in Plaintiff's 56.1 Statement and supporting evidence, defendants' motion for summary judgment should be denied in its entirety.

Dated:     New York, New York
          June 1, 2015                  Respectfully submitted,

                                    VLADECK, WALDMAN, ELIAS &
                                       ENGELHARD, P.C.

By:      /s/
                                    Anne C. Vladeck
                                    Anne L. Clark
                                    Ming-Qi Chu
                                    Attorneys for Plaintiff
                                    1501 Broadway, Suite 800
                                    New York, New York  10036
                                    (212) 403-7300