UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DR. DEIRDRE CHIARAMONTE,

                Plaintiff,

      - against -

THE ANIMAL MEDICAL CENTER and
KATHRYN COYNE,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

13 Civ. 5117 (KPF)

DECLARATION OF
DEENA WOLFSON

DEENA WOLFSON under penalty of perjury, affirms and states as follows:

1.     I worked for the The Animal Medical Center ("AMC") for forty years.

2.     I started in 1970 as a secretary, and worked in other administrative positions including supervisor of medical records and clinic manager.

3.     In the mid 1980s, I became secretary to then-Chief of Staff Bill Kay ("Kay") as well as secretary to the Board of Trustees. I was secretary to the Chief Executive Officer ("CEO") from approximately 1996 to approximately 2008 and remained the Secretary to the Board until I retired in August 2010.

4.     As secretary to the Chief of Staff and the CEO, I attended Board meetings and meetings of the Executive Committee of the Board. These meetings were taped by audio recording device.

5.     When Kay, who was a practicing veterinarian, served as CEO, he was the primary care physician to most pets of AMC donors and Trustees. When donor and Trustees would arrive for appointments, they would bring their pets directly to the fourth floor, where my office was located, rather than waiting in the main area on the second floor.

1

6. After Kay left in approximately 1996, AMC replaced him with Guy Pidgeon ("Pidgeon"), although a veterinarian by training, did not see patients

7. As a long time employee and secretary to the CEO, I was familiar with the credentials and skills of AMC doctors.

8. It became my responsibility to find doctors to treat donors' and Trustees' pets. These pet owners expected the highest quality care for their pets on demand in addition to consistent communication and follow-up.

9. Staff Veterinarians had very rigid schedules that did not allow for much time between assigned clinical responsibilities and teaching rounds to see other patients or to speak with patient owners either in person or on the phone. Many Staff Veterinarians were not comfortable around donors and Trustees.

10. Staff Veterinarians were not responsible for communication with patient owners after working hours.

11. Before I retired, AMC did not have an electronic medical records system. One constant problem that arose among different doctors treating the same patient was how to update one another on the patient's test results. The general practice was that the doctor ordering the test had the responsibility to inform the other doctors if any abnormalities appeared in the results.

12. Many doctors were assisted by technicians, whose role was to perform certain routine medical procedures so that doctors could devote more time to other tasks.

13. In the early 2000s, during Dr. Deirdre Chiaramonte's ("Chiaramonte") residency, I asked her to help treat a few donor and Trustee pets. She had a reputation for being one of the most talented residents.

684276 v1

14. Chiaramonte proved to be very capable at caring for these patients and was one of the few doctors willing to adjust her schedule to make time for donor and Trustee communication. I heard excellent feedback from the owners whose pets she treated.

15. After Chiaramonte's residency in 2002, she became a regular doctor for donor and Trustee pets.

16. In or around the mid-2000s, Pidgeon and I discussed with Bobby Liberman ("Liberman"), a long-time Trustee, formalizing the service donors and Trustees received. Liberman suggested naming the service the "President's Council."

17. We recognized that the President's Council had the potential to become a powerful fundraising tool as patient owners formed deeply rooted relationships with AMC staff. We understood that these relationships could take months or even years to develop.

18. The President's Council received a suite on the fourth floor. While we charged patient owners for services their pets received, the primary goal of the President's Council was fundraising. We did not expect the President's Council to generate significant revenue.

19. Shortly after Chiaramonte became Board-certified in Internal Medicine, then-Chief of Hospital, Michael Garvey ("Garvey"), and I agreed to make her the director and primary veterinarian of the President's Council. I knew having a Board-certified internist as the President's Council's primary care physician was important to the members.

20. After Chiaramonte became the director, the President's Council membership began to grow steadily. With Pidgeon and Garvey's approval, Chiaramonte was gradually relieved of her other clinical duties and teaching rounds to care for President's Council patients.

21. I assumed the role of President's Council Coordinator and acted as an assistant to Chiaramonte. In that position, I was responsible for scheduling patient appointments,

communicating with other specialists about patient care, assisting in ordering medication, and billing.

22. President Council's appointments generally lasted longer than other AMC appointments. Because President's Council was a concierge service, we made sure that the patient owners did not feel rushed. The appointments continued until all of the patient owner's questions and concerns had been addressed and he or she felt ready to leave.

23. President's Council members received on demand care and expected to reach Chiaramonte at all hours of the day and night. They also gave very little notice before coming in for appointments.

24. Outside the President's Council, Chiaramonte also had other AMC responsibilities. She spent about one third of her time at the Rehabilitation and Fitness service ("Rehab Center") and was involved in the Formulary Committee as well as her own research.

25. I never heard anything but positive feedback about Chiaramonte's veterinary skills and performance.

26. In the eight years we worked closely together in the President's Council, I never saw her behave inappropriately with patient owners or other doctors, either at AMC or at AMC-organized events. Her professionalism is one of the reasons Pidgeon, Garvey and I selected her to run the President's Council.

27. Chiaramonte always had good relationships with President's Council members, and many members considered her to be a friend.

28. President's Council staff were expected to make personal connections with donors and Trustees. During appointments, we discussed details of the members' family and social life, as well as other non-pet-related subjects. With the approval of AMC management,

Chiaramonte and I socialized with donors and Trustees outside of working hours. We also worked closely with the Development department.

29. I never heard Chiaramonte make disparaging remarks in the presence of donors or Trustees about President's Council members' families or fellow AMC doctors.

30. I never heard Chiaramonte make any racially insensitive comments. Specifically, I never heard her use the word "blackie" to refer to a person.

31. By the time Kathryn Coyne ("Coyne") became CEO in 2010, the President's Council had become, under Chiaramonte's direction, a valuable and established AMC service. Chiaramonte developed a loyal following of patient owners.

32. Before Coyne, a few managers, including Jeff Klausner ("Klausner") and his Chief Operating Officer, Bonnie Voiland ("Voiland"), had raised questions about the President's Council's patient load and productivity. Chiaramonte and I explained that the President's Council's purpose was to generate donations, not maximize revenue from appointments. Both Klausner and Voiland seemed to understand and accept our explanations and never raised the issue with either of us again.

33. In early 2010, I announced that I was retiring before the summer.

34. With input from Chiaramonte, I prepared a job description for the position. Because Coyne did not start looking for a replacement right away, I was asked me to stay until the end of summer 2010.

35. In early summer 2010, Coyne asked me whether I thought her sister, Margaret Barron ("Barron"), could fill in for me temporarily while they searched for a permanent replacement. I agreed with Coyne's idea, and also accepted AMC's proposal to stay until the end of the summer.

684276 v1

36. Shortly after my conversation with Coyne, Barron started at the President's Council and I was responsible for training her.

37. Barron was not familiar or comfortable with the computer system. While she took many notes, she did not seem to refer to them, and I often had to explain how to do the same task several times.

38. When President's Council members came in, I introduced Barron as my temporary replacement.

39. Even though Barron was not hired as the permanent President's Council Coordinator, Coyne asked me to stop using the word "temporary" because she said it might make the patients' owners insecure. I complied with Coyne's request.

40. In August 2010, I retired.

41. In or around July 24, 2012, Liberman called me to tell me that AMC was firing Chiaramonte for medical malpractice, inappropriate behavior, mismanagement of the Rehab Center.

42. Liberman did not mention any issues with Chiaramonte's low productivity.

43. I was shocked because Chiaramonte has always provided excellent care to patients and was well-liked and respected by patient owners and colleagues.

44. In my forty years at AMC, I do not remember a doctor being disciplined over a medical mistake. Even when a doctor gave a patient an overdose of chemotherapy, leading to the patient's death, AMC did not fire her.

684276 v1

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 29, 2015, in New York, New York.

_____
DEENA WOLFSON

7

684276 v1