UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

DR. DEIRDRE CHIARAMONTE,

                  Plaintiff,

            v.

THE ANIMAL MEDICAL CENTER, *et al.*,

                Defendants.

------------------------------------------------------X

                 13 Civ. 5117 (KPF)

                 <u>OPINION AND ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED #: _1/22/16_

KATHERINE POLK FAILLA, District Judge:

Plaintiff Deirdre Chiaramonte worked for the Animal Medical Center ("AMC") for ten years, from 2002 to 2012. In 2010, AMC hired Kathryn Coyne as its Chief Executive Officer and, shortly thereafter, AMC hired Coyne's sister, Margaret Barron, as an Assistant in a division where Plaintiff worked. Plaintiff contends that shortly after Barron's arrival, the sisters conspired to, and ultimately succeeded in, driving her from AMC; in July 2012, in a maelstrom of lurid accusations and extensive finger-pointing, Plaintiff was fired.

One year later, in July 2013, Plaintiff filed the instant litigation against AMC and Coyne (collectively, "Defendants"). She alleged that AMC violated the Equal Pay Act of 1963 (the "EPA"), 77 Stat. 56, 29 U.S.C. § 206(d), and its state-law analogue, Section 194 of the New York Labor Law (the "NYLL"), by paying male veterinarians higher wages than female veterinarians for substantially equal work. Separately, she alleges that Coyne tortiously interfered with Plaintiff's business relations and defamed her.

Pending before the Court is Defendants' motion for summary judgment on all counts. A careful review of the extensive factual record submitted by the parties makes plain that Plaintiff's EPA and NYLL claims cannot stand, because no reasonable juror could find that she received lesser pay for substantially equal work. Plaintiff's work — with its emphasis on fundraising and promotional activities — was important to AMC's sustenance, to be sure, but it was obviously, markedly, and qualitatively different from that of the other veterinarians she now proffers as comparators. The basis for federal jurisdiction having been extinguished, the Court declines to exercise jurisdiction over Plaintiff's remaining pendent state-law claims.

## BACKGROUND[1]

### A.    Factual Background

The record before the Court transcends Plaintiff's current claims of unequal pay; it encompasses a myriad of individuals and incidents over an

---

[1]    The facts stated herein are drawn from Defendants' Local Rule 56.1 Statement of Material Facts Not in Dispute ("Def. 56.1") (Dkt. #58); Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1") (Dkt. #69), which comprises both responses to Defendants' assertions of material facts not in dispute and material facts ostensibly in dispute; and the declarations (cited using the convention "[Name] Decl.") and exhibits thereto submitted with the parties' briefs. Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein. For convenience, Defendants' supporting brief (Dkt. #59) will be referred to as "Def. Br."; Plaintiff's opposition brief (Dkt. #68) as "Pl. Opp."; and Defendants' reply brief (Dkt. #76) as "Def. Reply." Individual deposition transcripts will be referred to using the convention "[Name] Dep." Finally, the transcript of the parties' November 1, 2013 conference with the Court will be referred to as "Tr."

The parties' respective Rule 56.1 Statements merit some discussion: Plaintiff chastises Defendants for "fill[ing] their statement of 'Material Undisputed Facts' with irrelevant details of the procedural history of the case and allegations unrelated to their legal arguments." (Pl. Opp. 1). The Court does not disagree with this assessment, but finds it rich coming from a party who proceeds to shoehorn some 500 additional paragraphs of ostensibly disputed facts into her Rule 56.1 Statement, and then refers the Court to that statement as Plaintiff's "more detailed statement of facts." (Id. at n.1). This circumvention of page limits violates the spirit of Rule 56, as well as the letter of Local

extended period of time.  Inasmuch as the resolution of the instant motion
focuses on the EPA and NYLL claims, the Court recites only those facts that are
relevant to their disposition — *viz.*, facts concerning the parties to the
litigation, the compensation system at AMC, and Plaintiff's putative
comparators — rather than recounting the totality of Plaintiff's employment
history at AMC and its denouement.

### 1.   The Defendants

AMC is a non-profit veterinary hospital that provides advanced
treatment, research, and education services for companion animals.  (Def. 56.1
¶ 1).  Its mission includes post-graduate veterinary education, charity care,
and research.  (*Id.* at ¶ 2).  Since 2010, Coyne has served as AMC's Chief
Executive Officer.  (*Id.* at ¶ 3).

AMC offers a range of services, two of which are implicated by this
litigation: (i) the President's Council (the "Council"); and (ii) the Tina Santi

---

Rule 56.1.  (*See* Local Rule 56.1(b) ("The papers opposing a motion for summary
judgment shall include . . . if necessary, additional paragraphs containing a separate,
short and concise statement of additional material facts as to which it is contended that
there exists a genuine issue to be tried.")).  Many of Plaintiff's proffered facts, such as
those concerning her background, are simply not in dispute.  And as noted in several
footnotes in this Opinion, several of Plaintiff's record cites do not in fact substantiate
the factual assertions contained in her Rule 56.1 Statement.

Defendants do not respond to the 500 or so paragraphs advanced by Plaintiff, despite
the Court's Individual Rule requiring same.  (*See* Individual Rules of Practice in Civil
Cases ¶ 5.C.ii (version as of Feb. 6, 2015) ("If additional factual allegations are made by
the opposing party, the moving party must file its own responsive 56.1 Statement
addressing the additional assertions.")).  The Court deems them to be disputed facts.
But as explained more fully in the Discussion section, the Court does not find that
Plaintiff's assertions, however numerous, create a genuine issue of material fact
sufficient to overcome the legal deficiencies in her EPA and NYLL claims.  The great
majority of Plaintiff's assertions concern her dealings with, and views of, Coyne and
Barron.  Furthermore, her allegations under the heading "Female Doctors in Other
Departments," are basically a roll call of doctors and salaries, with no effort made to
explain what each doctor did.

Flaherty Rehabilitation & Fitness Service (the "Rehab Center").  The Council is a concierge or "VIP" service that provides a primary care veterinarian and liaison service for high-level donors, board members, and others who pay a premium for the service.  (Def. 56.1 ¶ 94; Pl. 56.1 ¶ 389).  The Rehab Center is the only location in the New York City area offering a suite of rehabilitative services to companion animals.  (Def. 56.1 ¶ 115; Pl. 56.1 ¶¶ 426, 787).

### 2.    AMC's Compensation System for Veterinarians

Veterinarian compensation at AMC is determined through a formula that considers both objective and subjective criteria.  (Def. 56.1 ¶ 128).  Objectively, AMC calculates a percentage of the revenue generated by each veterinarian to establish an initial benchmark for ascertaining salaries.  (*Id.* at ¶¶ 131, 144). According to Defendants, the subjective criteria employed by AMC account for the veterinarian's: (i) level of involvement in teaching interns and residents; (ii) skills, abilities, and specific duties; (iii) creation of innovative methods of treating animals; (iv) uniqueness of practice; (v) complexity of procedures performed; (vi) level of responsibility, including responsibility for managerial duties; (vii) effort required to perform duties; and (viii) contributions to scholarly research, including quantity and quality of published research results.  (*Id.* at ¶¶ 134, 145).

Plaintiff largely agrees with Defendants' characterization of the subjective criteria, but contends that when setting salaries AMC also weighs a veterinarian's marketing and development activities, as well as their responsibility for cultivating relationships with donors.  (Pl. 56.1 ¶ 134).

4

### 3.   The Plaintiff

Deirdre Chiaramonte graduated Tufts University School of Veterinary Medicine in 1997 with a Doctorate of Veterinary Medicine.  (Pl. 56.1 ¶ 367).  In 1998, she completed her internship in small animal medicine and surgery at AMC.  (*Id.* at ¶ 368).  After finishing her residency at AMC in 2002, Plaintiff was hired by the hospital as a Staff Veterinarian.  (*Id.*; Chiaramonte Decl. ¶ 7; Chiaramonte Dep. 19).  Thereafter, in 2004, Plaintiff achieved Board Certification from the American College of Veterinary Internal Medicine.  (Def. 56.1 ¶ 88; Pl. 56.1 ¶¶ 369, 373; Chiaramonte Decl. ¶¶ 5, 8).

### a.   Plaintiff's Work on the President's Council

In 2004, the same year Plaintiff was promoted to Board Certified Internist by AMC, she relinquished her existing clinical and teaching duties to assume a full-time position on the Council.  (Def. 56.1 ¶¶ 96, 98, 103, 110-11; Pl. 56.1 ¶¶ 394-95; Chiaramonte Dep. 26-27, 66-67).  As the sole veterinarian assigned to the Council, Plaintiff held clinical, fundraising, and administrative responsibilities.  (*See* Pl. 56.1 ¶¶ 393, 396-97).

Clinically, Plaintiff served as the primary care veterinarian for many of the Council's patients.  (Chiaramonte Dep. 40).  When an individual joined the Council, Plaintiff was initially assigned to act as the primary care physician for the new member's pet.  (*Id.*).  However, if a patient experienced a recurring ailment that necessitated frequent visits to a particular specialist, that specialist often assumed responsibility as the patient's primary care provider.  (*Id.* at 41-42).

5

Plaintiff's responsibilities as a primary care veterinarian included administering annual exams, furnishing travel certificates, and performing checkups, as well as answering general questions from patients' owners. (Def. 56.1 ¶ 99; Pl. 56.1 ¶ 396). Aside from these tasks, Plaintiff also ordered blood work, requested diagnostic imaging, arranged for hospital admissions and discharges, and communicated with owners and caretakers. (Chiaramonte Dep. 48). Significantly, Plaintiff did not perform surgery, inpatient procedures, or other specialized procedures; to the contrary, her practice was limited to more routine tasks like drawing blood, injecting medications, administering oral medications, inserting IVs, and obtaining fecal samples — work typically performed by a general practitioner. (Def. 56.1 ¶¶ 21, 101; Pl. 56.1 ¶¶ 21, 101; Chiaramonte Dep. 55-56, 410; Goldstein Decl. ¶ 31).[2]

In addition to her clinical duties, Plaintiff's portfolio of responsibilities on the Council included marketing and fundraising. (Pl. 56.1 ¶ 400). As Plaintiff explained, and Defendants do not dispute, the Council was primarily a fundraising tool that was designed to produce a base of regular donors through the development of relationships with potential contributors. (*Id.* at ¶¶ 390, 403, 415). As a corollary, Plaintiff's job on the Council included maintaining strong relationships with current and potential donors. (*Id.* at ¶ 786). Plaintiff developed these relationships by, among other things, devoting individualized

---

[2]     To the extent a patient required additional care, Plaintiff referred them to other veterinarians for diagnostic tests or treatments. (Def. 56.1 ¶ 100). However, Plaintiff remained responsible for "communicat[ing] with the [patient's] owner[] or caretaker[]." (Chiaramonte Dep. 42).

attention to each patient and learning details about the patient's owners. (*Id.* at ¶ 393). Plaintiff's fundraising activities also entailed meeting with AMC's Development Department, apprising the Department of information about Council members that was unrelated to patient care, attending AMC-organized events with donors, and promoting the Council at public appearances. (*Id.* at ¶¶ 400, 404; Chiaramonte Dep. 35-37, 39).

Plaintiff's administrative responsibilities on the Council included overseeing its day-to-day activities. (Pl. 56.1 ¶ 397). To this end, Plaintiff completed paperwork relating to patient discharges and billing, as well as supervised the activities of the sole technician assigned to the Council. (*Id.*; Chiaramonte Dep. 51-52, 57). Despite overseeing the technician's day-to-day activities, Plaintiff was not ultimately responsible for performing the technician's annual evaluation. (*Id.* at 57-58). In fact, the only written annual evaluation Plaintiff performed at AMC was for Margaret Barron, the sister of Defendant Coyne. (Def. 56.1 ¶ 105).

### b.   Plaintiff's Work at the Rehab Center

At the time of her termination, Plaintiff also served as the sole Director of the Rehab Center, a position that likewise encompassed clinical, developmental, and administrative responsibilities. (Def. 56.1 ¶ 113; Pl. 56.1 ¶¶ 416-17). Clinically, technicians performed the "overwhelming majority" of patient evaluations and treatments at the Rehab Center. (Greene Decl. ¶ 17; Def. 56.1 ¶ 364; Chiaramonte Dep. 105). Nevertheless, Plaintiff occasionally evaluated patients and rendered rehabilitative treatments like cryotherapy,

hyperthermia, laser therapy, therapeutic ultrasound, transcutaneous electrical nerve stimulation, pulsed electromagnetic field therapy, neuromuscular electrical stimulation, land-based and underwater treadmill protocols, therapeutic exercise, and shockwave therapy. (Pl. 56.1 ¶¶ 426, 789; Chiaramonte Dep. 98-102).[3]

Although Plaintiff claims that she performed specialty medicine in the Rehab Center, the evaluations and treatments that she conducted were routinely undertaken by technicians without the supervision of a veterinarian. (Pl. 56.1 ¶ 159; Chiaramonte Dep. 98-100, 102). In fact, Plaintiff could not identify a single treatment that she administered at the Rehab Center that a technician was incapable of performing. (*Id.* at 99).[4]

Here, too, Plaintiff's job responsibilities went beyond medical: As director, Plaintiff was also responsible for raising the profile of the Rehab Center. (Pl. 56.1 ¶ 428). Plaintiff employed a variety of approaches to this assignment, including informally networking with veterinarians at veterinary events in New York City. (*Id.*; Chiaramonte Dep. 145-46). Plaintiff also made herself available to answer questions about the Rehab Center at monthly Veterinary Medical Association meetings. (Pl. 56.1 ¶ 428; Chiaramonte

---

[3]  Plaintiff claims that she "regularly" evaluated patients for treatment. (Pl. 56.1 ¶ 427). However, the underlying evidence cited by Plaintiff does not support this characterization. Specifically, at her deposition, Plaintiff testified that she would go for months without performing an evaluation. (Chiaramonte Dep. 102).

[4]  Plaintiff asserts that she "treated and evaluated the most complex rehabilitation cases which technicians did not have the training to perform." (Pl. 56.1 ¶ 790). Once again, the evidence cited by Plaintiff does not support her position. Plaintiff relies on her declaration, which notes, in much less sweeping fashion, that "[w]hen technicians came across difficult questions or cases, I advised them." (Chiaramonte Decl. ¶ 44).

Dep. 146). In addition, Plaintiff prepared material for brochures, accepted interviews from the media, and coordinated with AMC's Development Department to raise awareness about the Rehab Center. (Pl. 56.1 ¶ 428).

Plaintiff's administrative responsibilities in the Rehab Center included "overseeing day-to-day operations." (Pl. 56.1 ¶ 796). However, unlike in the Council, Plaintiff did not supervise the approximately three technicians and four rehabilitation aides assigned to the Rehab Center. (Chiaramonte Dep. 56-57, 78-80; Def. 56.1 ¶ 116). Those individuals were supervised by Bill Tavolacci. (Chiaramonte Dep. 74-76, 78-80, 89-90).[5]

### c.   Plaintiff's Patient Responsibilities

Although the parties agree that Plaintiff worked in two departments, they dispute how many patients per day Plaintiff treated during her tenure. Plaintiff claims that her case load on the Council gradually increased from 2004 through 2012, and that she treated an average of two to three patients per day. (Chiaramonte Dep. 31; Pl. 56.1 ¶ 397). According to Plaintiff, by the end of her tenure at AMC, she spent approximately four hours per day treating Council patients. (Chiaramonte Dep. 48-49). Plaintiff further maintains that she

---

[5]   In an affidavit submitted in opposition to the instant motion, Plaintiff claims that the Rehab Center's technicians and aides reported to her. (Chiaramonte Decl. ¶ 46). However, during her deposition she testified that the technicians and aides were supervised by Tavolacci. (Chiaramonte Dep. 89-90). Plaintiff cannot raise a genuine issue of material fact by introducing an affidavit that contradicts her prior testimony. *Hayes* v. *New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

treated between one and three patients per day in the Rehab Center.  (Pl. 56.1 ¶ 426).[6]

Defendants counter that, depending on the year, Plaintiff treated an average of between 1.5 and 2.67 patients per day.  (Cusumano Decl. Ex. 13). Notwithstanding the divergent numbers, the parties agree on two points concerning Plaintiff's patient load:  *First*, Plaintiff was informed during several of her annual evaluations that her case load was too low.  (Chiaramonte Dep. 131-32).  *Second*, irrespective of the precise numbers, Plaintiff maintained a smaller-than-average patient load.  (Def. 56.1 ¶ 97; Pl. 56.1 ¶ 97).

### d.    Plaintiff's Research Output

In addition to her Council and Rehab Center responsibilities, Plaintiff also conducted research during her tenure at AMC, albeit on an inconsistent and ultimately diminishing basis.  Beginning in 2003, Plaintiff published research in a peer-reviewed journal in order to obtain her Board certification in Internal Medicine.  (Chiaramonte Dep. 19-20).  In 2004, Plaintiff conducted research into equipment, modalities, and fee schedules in connection with the establishment of the Rehab Center.  (*Id.* at 70-71).  Although she contributed to several veterinary reference textbooks, construing the evidence in Plaintiff's favor, the Court finds that the last research she submitted for publication was in 2009.  (Def. 56.1 ¶¶ 103, 123; Pl. 56.1 ¶¶ 103, 123; Goldstein Decl. ¶ 30; Chiaramonte Dep. 103-04).

---

[6]    These patients included patients that Plaintiff was treating in her Council capacity. (Chiaramonte Dep. 96-97).

By 2011, Plaintiff's evaluation rated her "scholarship educational contribution" as poor.  (Cusumano Decl. Ex. 27).  That said, Plaintiff acknowledged that scholarship was not part of her job description.  (Def. 56.1 ¶ 123; Pl. 56.1 ¶ 123; Chiaramonte Dep. 243-45).

### 4.     The Proffered Comparators

During the relevant time period, AMC employed a number of other veterinarians, including Dr. Philip Fox, Dr. Anthony Fischetti, Dr. Mark Macina, Dr. Chadwick West, and Dr. Doug Palma.  Plaintiff cites them as comparators for her EPA and NYLL claims, i.e., as individuals who received greater compensation than she for substantially equal work.  Analysis of their backgrounds and job responsibilities is thus critical to the resolution of this motion.

Dr. Fox, a Board-certified Cardiologist, is the Service Head for the Cardiology Department, where his responsibilities include clinical duties as well as teaching cardiology residents and interns.  (Def. 56.1 ¶ 185(f)).  In addition, he serves as the head of AMC's Caspary Institute for Research and Postgraduate Education Institute, a position requiring him to oversee and support all research at AMC.  (*Id.*).

Dr. Fischetti, a Board-certified Radiologist, is Chief of AMC's Diagnostic Imaging Service, and his expertise includes radiography, ultrasonography, and running as well as interpreting magnetic resonance imaging ("MRI") and computerized tomography ("CT") scans.  (Def. 56.1 ¶ 185(c)).  Dr. Fischetti's

responsibilities also include overseeing interns, residents, and a large number of technical staff.  (*Id.*).

Dr. Macina is a veterinary dermatologist.  (Def. 56.1 ¶ 185(e)). Defendants contend — and Plaintiff does not dispute — that dermatologists are "very, very sought after" in the veterinary world, and that Dr. Macina in particular "has a tremendous number of loyal, recurrent patients with chronic skin disease, resulting in a consistent source of revenue" to AMC.  (*Id.*; Pl. 56.1 ¶ 185(e)).  As evidence of his loyal patient following, Dr. Macina saw at least approximately ten patients per day and approximately 50 patients per week. (Def. 56.1 ¶ 185(e)).

Dr. West is Board-certified in Neurology and Neurosurgery and is the Chief of AMC's Neurology Service, where he is responsible for supervising five doctors, including one neurologist, one intern, and three residents.  (Def. 56.1 ¶ 185(a)).  Dr. West also runs the Neurology Residency Program, requiring him to mentor at least one resident at all times in addition to selecting residents, performing daily rounds, providing quarterly updates to the American College of Internal Medicine (Neurology), and completing biannual formal resident reviews.  (*Id.*).  In addition, Dr. West is "heavily involved in research" and "significant[ly] contribut[es] to research" at AMC.  (Goldstein Decl. ¶ 39; Def. 56.1 ¶ 185(a)).

Dr. Palma is Board-certified in Internal Medicine, and serves as an Internal Medicine Specialist at AMC, a position requiring him to see approximately 10 to 15 patients per day.  (Def. 56.1 ¶¶ 162, 166; Clark Decl.

Ex. 81).  Dr. Palma also serves as the Medical Director of the Special Care Unit,

a hospitalization ward for in-patient care.  (Def. 56.1 ¶ 166).  In these roles, he

personally performs complex interventional procedures, including ureteral and

tracheal stenting, ultrasounds, bone marrow aspirates, biopsies, colonoscopies,

rhinoscopy, cystourethroscopy, esophagostomy, thoracentesis, balloon

catheterization of vascular vessels, and E tube placement.  (*Id.* at ¶ 162;

Goldstein Decl. ¶ 27).  Dr. Palma also "makes significant contributions to

research" in the field of Internal Medicine and teaches interns as well as

residents on a full-time basis.  (*Id.* at ¶ 36; Def. 56.1 ¶¶ 165, 169).[7]

## B.    Procedural Background

Plaintiff filed her initial Complaint on July 23, 2013, alleging:

(i) discrimination under the EPA against AMC (Count I); (ii) discrimination

under the NYLL against AMC (Count II); (iii) tortious interference against Coyne

(Count III); and (iv) defamation against Coyne (Count IV).  (Dkt. #1).  In

response to Defendants' request to file a motion to dismiss under Federal Rule

of Civil Procedure 12(b)(6), the Court held a pre-motion conference on

November 1, 2013, where the contours of Plaintiff's EPA claim were discussed.

Specifically, the Court noted that "in reading the complaint equal pay wasn't

---

[7]     On several occasions in her Rule 56.1 Statement, Plaintiff attempts to raise issues of fact by asserting that "a jury is not required to believe the testimony of interested witnesses." (*See, e.g.*, Pl. 56.1 ¶ 169).  However, beyond this blanket assertion, Plaintiff makes no effort to controvert the fact at issue by, for example, citing to contradictory evidence in the record as is required by Local Civ. R. 56.1(d).  Ultimately, this strategy cannot create a genuine issue of material fact where none is otherwise evident from the record.  *See Salib* v. *P & O Ports N. Am., Inc.*, No. 05 Civ. 5313 (NG) (MDG), 2008 WL 4724008, at *1 n.1 (E.D.N.Y. Oct. 28, 2008) ("[T]hat an 'interested witness' has testified to a certain issue does not, in and of itself, raise a genuine issue of material fact.").

the first thing that came to mind"; rather, the allegations "sounded like [Plaintiff] had an extraordinary personality conflict with the sister of the woman who took over the facility," and as a consequence, this case was not "the prototypical equal pay or gender discrimination case." (Tr. 10-11).

Following the conference, Plaintiff filed an Amended Complaint, the operative pleading in this case, which added additional factual support for the claims alleged in the original Complaint. (Dkt. #15). Thereafter, Defendants filed a motion to dismiss Plaintiff's EPA and NYLL claims. (Dkt. #25). Although Defendants' motion was denied, the Court once again expressed skepticism about Plaintiff's EPA and NYLL claims, observing that "Plaintiff has cleared the bar here by a very narrow margin." *Chiaramonte* v. *Animal Med. Ctr.*, No. 13 Civ. 5117 (KPF), 2014 WL 3611098, at *6 (S.D.N.Y. July 22, 2014). The Court concluded that it was not "offer[ing] any opinion, even prospectively, as to whether Plaintiff's allegations on this score could survive summary judgment on a more complete evidentiary record." *Id.*

After discovery closed, Defendants filed a motion for summary judgment on May 21, 2015, arguing that Plaintiff's EPA, NYLL, tortious interference, and defamation claims all failed as matter of law. (Dkt. #57). The motion, which was opposed by Plaintiff, was fully submitted on June 15, 2015.

14

**DISCUSSION**

A.    **Applicable Law**

    1.    **Summary Judgment in Employment Discrimination Cases**

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

15

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

The Second Circuit has admonished district courts to exercise caution in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). However, "'summary judgment is appropriate even in discrimination cases, for the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu* v. *Chase Inv. Serv. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (summary order) (quoting *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *superseded by statute on other grounds as stated in Ochei* v. *Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)). Indeed, "it is now beyond cavil that summary judgment may be appropriate even in the fact-

16

intensive context of discrimination cases." *Feingold* v. *New York*, 366 F.3d 138, 149 (2d Cir. 2004) (internal citation and quotation marks omitted).

### 2.    The Equal Pay Act

The EPA prohibits employers from discriminating between employees on the basis of sex.  29 U.S.C. § 206(d).  Among other things, it provides that

> [n]o employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]

*Id.* § 206(d)(1).

Claims under the EPA are analyzed using a burden-shifting framework similar to that established in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).  *See Ryduchowski* v. *Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000).  Under the framework, the plaintiff bears the initial burden of establishing a *prima facie* case by demonstrating "that '[i] the employer pays different wages to employees of the opposite sex; [ii] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [iii] the jobs are performed under similar working conditions." *E.E.O.C.* v. *Port Auth. of N.Y. & N.J.* ("*Port Authority*"), 768 F.3d 247, 254-55 (2d Cir. 2014) (quoting *Belfi* v. *Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).

While *Port Authority* arose in the context of a motion for judgment on the pleadings, the Second Circuit in that decision analyzed its prior summary judgment precedent in deciding what a plaintiff must plead to demonstrate "equal work." The Court's analysis is thus equally instructive in this setting:

> *While the equal work inquiry does not demand evidence that a plaintiff's job is "identical" to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are "substantially equal." To satisfy this standard, a plaintiff must establish that the jobs compared entail common duties or content, and do not simply overlap in titles or classifications.* This focus on job content has been a constant in the context of the EPA. For example, the EEOC's own regulations provide that "equal work" under the EPA is established not by reference to "job classifications or titles but ... rather [by] actual job requirements and performance." 29 C.F.R. § 1620.13(e). Similarly, the EEOC's Compliance Manual states that "[j]ob content ... determines the equality of jobs," and "whether two jobs are substantially equal" turns on "whether the jobs have the same 'common core' of tasks." EEOC Compliance Manual § 10-IV(E)(2) (2000).
>
> The EEOC's regulations also define the statutory criteria underlying the equal work inquiry — equal skill, effort, and responsibility — by reference to actual job content. For example, equal skill is defined as including "such factors as experience, training, education, and ability," as measured "in terms of the performance requirements of the job" at issue. 29 C.F.R. § 1620.15(a). Equal effort, by turn, looks to "the measurement of the physical or mental exertion needed for the performance of a job." *Id.* § 1620.16(a). And equal responsibility turns on "the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." *Id.* § 1620.17(a). In addition, the regulations illustrate these definitions by reference to fact-intensive examples that emphasize the centrality of job content to the equal work inquiry, such as supermarket employees who are either required to move heavy boxes or reorganize small

> merchandise, and sales clerks who are either entrusted to determine whether to accept personal checks or who are not so empowered. *See id.* §§ 1620.15-17.
>
> ***
>
> To be sure, the bulk of these cases concerned whether the plaintiffs had proven their EPA claims following summary judgment or trial, not whether the plaintiffs had adequately pleaded their claims. Nonetheless, these cases as well as the EEOC's regulations and Compliance Manual stand for a common principle: a successful EPA claim depends on the comparison of *actual job content*; broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice[.]

768 F.3d at 255-56 (emphasis supplied; original emphases omitted; internal citations omitted).

If a plaintiff establishes a *prima facie* case, an employer can avoid liability by proving that the pay disparity was attributable to one of four affirmative defenses: "'(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Belfi,* 191 F.3d at 136 (quoting 29 U.S.C. § 206(d)(1)). If the employer uses the fourth defense, it must show a "legitimate business reason" for the pay disparity. *Id.* "The burden of establishing one of the four affirmative defenses is 'a heavy one,' because the statutory exemptions are 'narrowly construed.'" *Ryduchowski,* 203 F.3d at 143 (internal citations omitted). A plaintiff may also overcome the affirmative defense proffered by the employer "by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Belfi,* 191 F.3d at 136.

### 3.    The NYLL

"An equal pay claim under New York Labor Law § 194 'is analyzed under the same standards applicable to the federal Equal Pay Act.'" *Talwar* v. *Staten Island Univ. Hosp.*, 610 F. App'x 28, 31 n.2 (2d Cir. 2015) (summary order) (quoting *Pfeiffer* v. *Lewis County*, 308 F. Supp. 2d 88, 98 n.8 (N.D.N.Y. 2004)); *see also Volpe* v. *Nassau County.*, 915 F. Supp. 2d 284, 291 n.5 (E.D.N.Y. 2013) ("'Claims for violations of the Equal Pay Act and the [NYLL] may be evaluated under the same standard.'" (quoting *Rose* v. *Goldman, Sachs & Co.*, 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001))).

## B.    Analysis

### 1.    Plaintiff Has Failed to Establish a *Prima Facie* Case Under the EPA or the NYLL

Defendants contend that Plaintiff has not established a *prima facie* case under the EPA and the NYLL because she cannot prove that she performed equal work to any male veterinarian at AMC.  (Def. Br. 6; Def. Reply 2). Alternatively, Defendants maintain that any pay disparities were attributable to differentials based on any factor other than sex.  (Def. Br. 10; Def. Reply 4). Plaintiff counters Defendants' *prima facie* argument by asserting that she performed equal work to that of Drs. Fox, Fischetti, Macina, West, and Palma, but was nevertheless paid less than these men.  (Pl. Opp. 25-26).[8]  Plaintiff also avers that genuine issues of material fact exist with respect to whether

---

[8]    Although other doctors were mentioned during discovery, Plaintiff's opposition brief only identifies Drs. Fox, Fischetti, Macina, West, and Palma as comparators.  (Pl. Opp. 25-26).

differences in compensation were "based on any factor other than sex." (*Id.* at 28). After closely reviewing the record, the Court agrees with Defendants that Plaintiff has failed to establish a *prima facie* case because she cannot demonstrate that she received unequal pay for substantially equal work; for this reason, it declines to resolve the proffered affirmative defense.

No reasonable juror could find that Plaintiff performed substantially equal work to the male veterinarians she identified as comparators. As the Second Circuit explained, a plaintiff advancing claims under the EPA "must establish that the jobs compared entail common duties or content, and do not simply overlap in titles or classifications." *Port Authority*, 768 F.3d at 255. In other words, the focus is on job content, and, more precisely, "the congruity and equality of actual job content between the plaintiff and comparator." *Id.* Ultimately, the plaintiff must show "that her position and that of a given comparator are 'substantially equal' in skill, effort, and responsibility." *Drury* v. *Waterfront Media, Inc.*, No. 05 Civ. 10646 (JSR), 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007) (citing *Lavin-McEleney* v. *Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001)).

Plaintiff's claim distills to the argument that she, Dr. Fox, Dr. Fischetti, Dr. Macina, Dr. West, and Dr. Palma performed substantially equal work because they all either: (i) ran a department in a sought-after specialty; or (ii) had relationship-building, development, or other fundraising responsibilities. (Pl. 56.1 ¶ 31). However, the parallels Plaintiff draws are far outstripped by the material differences in practices, teaching obligations,

21

patient loads, and research contributions between and among Plaintiff and her alleged comparators.

Plaintiff's arguments in opposition to Defendants' motion are predicated on a misapplication of the law, one which seeks to equate job significance (a point on which the Court takes no position) with job content (a point critical to the establishment *vel non* of Plaintiff's *prima facie* case). Indeed, Plaintiff's arguments only serve to underscore her singular status among veterinary professionals at AMC:

> Plaintiff notes that she, "unlike many other veterinarians, was willing to spend the time that [Board of Trustees members and other major donors] required, and was comfortable speaking with them." (Pl. Opp. 2). Presumably for this reason, she was assigned to the Council, which itself was created with the belief that "by providing 'concierge' services, [AMC would] develop strong relationships with the owners to generate large donations." (*Id.*).

> While Plaintiff initially attempted to juggle her divergent responsibilities, in 2004, "AMC made managing the President's Council her full-time responsibility." (Pl. Opp. 2). As a result, Plaintiff saw fewer patients than other specialists, because (i) "the members [of the Council] expected that Chiaramonte would devote her full attention to them and take as much time as necessary to answer all of their questions," and (ii) she had "additional responsibilities in marketing and development," which responsibilities only grew with the opening of the Rehab Center. (*Id.* at 2-3; *see also, e.g.,* Pl. 56.1 ¶¶ 97, 393, 428).

> As Council membership grew, Plaintiff was relieved of other responsibilities imposed on her comparators. (Def. 56.1 ¶ 111; Pl. 56.1 ¶ 111). For example, Plaintiff no longer taught residents or performed rounds. (*See*

Def. 56.1 ¶ 103, Chiaramonte Dep. 65-67; Goldstein Decl. ¶ 30).[9]

·   With her Council patients, Plaintiff acted as a primary care doctor rather than a specialist, performing only routine procedures. (Def. 56.1 ¶¶ 94, 98-99, 101). In fact, Plaintiff only occasionally received referrals from other veterinarians to act as an Internal Medicine specialist. (Chiaramonte Dep. 45-47). Similarly, at the Rehab Center, Plaintiff only occasionally evaluated patients, and while she administered certain treatments with greater regularity, these procedures could all be performed by technicians without supervision from a veterinarian. (Pl. 56.1 ¶¶ 159, 426, 789; Chiaramonte Dep. 99, 101-02).

·   By 2009, Plaintiff no longer conducted research. (Def. 56.1 ¶ 103; Goldstein Decl. ¶ 30).[10] Plaintiff further acknowledged that, unlike several of her comparators, she was not expected to publish scholarly research. (Pl. 56.1 ¶ 123).

Undaunted by these differences, Plaintiff likens herself to her comparators by noting, among other things, that she also "contributed substantially as an AMC citizen through assuming significant administrative responsibilities and generating millions of dollars in indirect revenue." (Pl. 56.1 ¶ 152). Such a comparison, of course, proves too much: Taking as a given that Plaintiff's efforts bettered AMC's bottom line, such a statement does not

---

[9]   During her deposition, Plaintiff testified that once she was assigned to the Council, she no longer taught interns or residents, a point in which AMC's Chief Medical Officer concurred. (Chiaramonte Dep. 66; see also Def. 56.1 ¶ 111; Pl. 56.1 ¶ 111; Goldstein Decl. ¶ 30). In opposing the instant motion, however, Plaintiff has offered conflicting statements that, construed in her favor, suggest supervision (but not formal instruction) of interns. (See Pl. 56.1 ¶¶ 103, 111, 165; cf. Chiaramonte Decl. ¶ 47).

[10]   To the extent that Plaintiff claims that she conducted substantial research with respect to the Rehab Center, this research occurred in connection with the creation of the facility; any scholarly research was concluded by 2009, and is temporally irrelevant to her EPA claims. (See Chiaramonte Decl. ¶ 35; Chiaramonte Dep. 70-71). Her assertion that she was preparing to conduct research at the time of her termination is insufficient to create a genuine issue of material fact. (Chiaramonte Decl. ¶ 53).

23

demonstrate that the *content* of her job responsibilities was substantially equal to that of her comparators.  In point of fact, a review of the record confirms that it was not.

Throughout her submissions, Plaintiff cherry-picks certain points of commonality with her comparators, while turning a blind eye to major differences in skill, effort, and responsibilities.  For example, Plaintiff contends that she and Dr. Fox performed equal work because they both: (i) maintained substantial managerial and administrative responsibilities; (ii) worked with the Development Department and donors to obtain funds; (iii) did not participate in rounds; and (iv) treated a limited number of patients.  (Pl. 56.1 ¶¶ 185(f), 798, 800; Pl. Opp. 25).  Even accepting these similarities at face value, the Court cannot ignore, as Plaintiff wishes, the marked differences between the content of her job and that of Dr. Fox's.  *First,* Dr. Fox, as a Board-certified Cardiologist who ran the Cardiology Department, practiced in a field of medicine that required different experience, training, education, and ability than Plaintiff's practice.  (Def. 56.1 ¶ 185(f)).  *Second,* unlike Plaintiff, Dr. Fox was responsible for teaching residents.  (*Id.*).  *Third,* Dr. Fox, as the head of the Caspary Institute for Research, was integrally involved in research at AMC, an area in which Plaintiff did not actively participate after 2009.  (*Id.*).  Accordingly, while Plaintiff and Dr. Fox may have shared a few common responsibilities, no reasonable juror could find that their jobs were substantially equal given the differences in specialization, teaching responsibilities, and research.

Plaintiff next asserts that she and Dr. Fischetti performed substantially equal work because they both were responsible for communicating and coordinating testing with other veterinarians.  (Pl. 56.1 ¶¶ 185(c), 802; Pl. Opp. 25).  In addition, she suggests, Dr. Fischetti did not have an independent case load and offered services that were heavily dependent on technicians.  (Pl. 56.1 ¶¶ 185(c), 804; Pl. Opp. 25).  Finally, according to Plaintiff, Dr. Fischetti also had significant administrative responsibilities.  (Pl. 56.1 ¶ 803; Pl. Opp. 25).

Once again, critical distinctions separate the job performed by Dr. Fischetti from the job performed by Plaintiff.  For starters, Dr. Fischetti as a Board-certified Radiologist and Chief of AMC's Diagnostic Imaging Service practiced in a field of veterinary medicine that called on different experience, training, education, and ability from Plaintiff's practice.  (Def. 56.1 ¶ 185(c)). Moreover, unlike Plaintiff, Dr. Fischetti's job also required him to supervise residents.  (*Id.*).  Based on these differences, no reasonable jury could conclude that the jobs performed by Dr. Fischetti and Plaintiff were substantially equal given the differences in specialization and supervisory responsibilities.

Plaintiff also contends that she and Dr. Macina performed equal work because they both: (i) were the only veterinarians assigned to their respective departments; (ii) had loyal followings of patients; and (iii) performed procedures that could be undertaken by technicians.  (Pl. 56.1 ¶¶ 185(e), 806-08; Pl. Opp. 25-26).  In identifying these similarities, Plaintiff has glossed over a number of compelling distinctions between her job and Dr. Macina's job.  As a

dermatologist, Dr. Macina's practice required different experience, training, education, and ability from Plaintiff's practice. (Def. 56.1 ¶ 185(e)).  In addition, Dr. Macina saw at least ten patients a day, whereas Plaintiff only treated between two and three patients per day in the Council, and between one and three patients per day in the Rehab Center.  (*Id.*).  Because of these differences in specialization and case load, no reasonable jury could conclude that the jobs performed by Plaintiff and Dr. Macina were substantially equal.

Plaintiff appears to draw parallels between her job and Dr. West's job based on the fact that: (i) Dr. West was responsible for training only one resident; (ii) he performed treatments with the aid of technicians; and (iii) his examinations and treatments could be performed by technicians.  (Pl. 56.1 ¶¶ 185(a), 814-15; Pl. Opp. 26).  Accepting these similarities, the Court finds that Plaintiff still fails to account for the fact that Dr. West, who is Board-certified in Neurology and Neurosurgery and Chief of AMC's Neurology Service, practiced in an area of medicine that involved different experience, training, education, and ability than Plaintiff's practice.  (Def. 56.1 ¶ 185(a)).  Dr. West also supervised five doctors and led the Neurology Residency Program, which entailed a host of additional responsibilities that Plaintiff did not perform in her practice.  (*Id.*).

Even if Dr. West only trained one resident, as asserted by Plaintiff, this was one more resident than Plaintiff was responsible for training.  Finally, unlike Plaintiff, Dr. West furnished "significant contributions" to AMC's research efforts.  (Goldstein Decl. ¶ 39; Def. 56.1 ¶ 185(a)).  Based on these key

distinctions in specialization, supervision, teaching, and research, no reasonable juror could conclude that the jobs performed by Plaintiff and Dr. West were substantially equal.

Finally, Plaintiff asserts that she and Dr. Palma performed equal work because they both: (i) were Board-certified in Internal Medicine; (ii) performed specialized procedures; (iii) served as directors of AMC departments; (iv) oversaw interns; (v) communicated with staff in the provision of medical services; and (vi) contributed to AMC's mission. (Pl. 56.1 ¶¶ 162-69, 810; Pl. Opp. 26). Upon closer examination, these alleged similarities cannot bear the weight they are assigned by Plaintiff. Admittedly, Dr. Palma and Plaintiff are both Board-certified in Internal Medicine, but the actual content of their jobs differed substantially. (Clark Decl. Ex. 81). In his practice, Dr. Palma performed a host of complex procedures, including ureteral and tracheal stenting, ultrasounds, bone marrow aspirates, biopsies, colonoscopies, rhinoscopy, cystourethroscopy, esophagostomy, thoracentesis, balloon catheterization of vascular vessels, and E tube placement. (Def. 56.1 ¶ 162). Plaintiff concedes that she did not perform these specialty procedures, instead performing procedures akin to a general practitioner. (*Id.* at ¶¶ 101, 163-64; Pl. 56.1 ¶ 163). And whatever specialty medicine Plaintiff performed in her capacity as director of the Rehab Center (a point subject to some debate) was in the quite different field of rehabilitation. (*Id.* at ¶¶ 159, 163).

Although Plaintiff may have overseen interns in the Rehab Center, Dr. Palma held the added responsibility of teaching residents on a full-time basis.

(Def. 56.1 ¶ 165).  In addition, Dr. Palma, unlike Plaintiff, "significant[ly] contribut[ed]" to Internal Medicine research at AMC.  (*Id.* at ¶ 169).  Plaintiff attempts to downplay the significance of this fact by arguing that she also contributed to research and to AMC's overall mission.  (Pl. 56.1 ¶ 169). However, Plaintiff did not perform research after 2009, and her contributions to AMC principally involved fundraising — work requiring wholly different skill and effort.  Finally, Dr. Palma saw approximately 10 to 15 patients per day, which was more than Plaintiff saw in her Council and Rehab Center workloads combined.  (Def. 56.1 ¶ 166).  Given these important distinctions, no reasonable juror could find that the work performed by Plaintiff and Dr. Palma was substantially equal.

In sum, Plaintiff's efforts to draw comparisons to Dr. Fox, Dr. Fischetti, Dr. Macina, and Dr. West miss the mark because they essentially require the Court to embrace the principle that the work of all veterinarians is equivalent, thereby ignoring distinctions among the different specialties in veterinary medicine.  The Second Circuit's reasoning in *Port Authority*, decided as it was in the context of a Rule 12(c) motion, has even more significance in this setting. There, the EEOC alleged that the Port Authority had violated the EPA by paying its female nonsupervisory attorneys at a lesser rate than their male counterparts for "equal work."  *Port Authority*, 768 F.3d at 248-49.  In support of its contention that female and male attorneys at the Port Authority performed equal work, the EEOC averred, in part, that all of the attorneys' jobs required:

> [i] the same professional degree and admission to the
> bar; [ii] problem-solving and analytical skills to identify,
> research, analyze, evaluate, and resolve legal issues
> clearly and persuasively; [iii] the use of professional
> judgment and legal skills to draft, review, and
> implement legal documents; [iv] the ability to
> understand and comply with department, agency, and
> legal instructions and procedures; [v] the ability to
> consult with and provide legal advice to the same client,
> the Port Authority; [vi] the ability to interact and consult
> with outside legal staff or other Port Authority attorneys
> on client matters; [vii] the same degree of diligence and
> persistence; and [viii] the ability to manage time, meet
> deadlines, and prioritize assignments.

*Id.* at 250-51.

In affirming the district court's dismissal, the Court held that the EEOC's "bland abstractions — untethered from allegations regarding Port Authority attorneys' actual job duties — say nothing about whether the attorneys were required to perform 'substantially equal' work." *Port Authority*, 768 F.3d at 257. As a consequence, "the EEOC's complaint provides no guidance as to whether the attorneys handled complex commercial matters or minor slip-and-falls, negotiated sophisticated lease and financing arrangements or responded to employee complaints, conducted research for briefs or drafted multimillion-dollar contracts." *Id.* Of particular significance to the instant motion, the EEOC could not evade its failure to plead more specific information concerning Port Authority attorneys' job duties on the theory that "all lawyers perform the same or similar function(s) and that most legal jobs involve the same skill." *Id.* (internal citation and quotation marks omitted). In other words, it was not enough for the EEOC to argue that the attorneys at the Port Authority

29

performed substantially equal work because "an attorney is an attorney is an attorney." *Id.*

Here, Plaintiff has essentially argued that she performed the same work as Dr. Fox, Dr. Fischetti, Dr. Macina, and Dr. West because she also headed a department. This is the veterinary equivalent of the EEOC's argument, and it fails for the same reason: It ignores the fundamental distinctions between the work performed by a cardiologist, a radiologist, a dermatologist, a neurologist, an internist, and a rehabilitation specialist. Accordingly, Plaintiff's theory that she, Dr. Fox, Dr. Fischetti, Dr. Macina, and Dr. West performed equal work by virtue of their positions as department heads at AMC is untenable. *See Fisher* v. *Vassar Coll.*, 70 F.3d 1420, 1452 (2d Cir. 1995) (vacating judgment in favor of plaintiff on EPA claim where plaintiff never introduced evidence establishing that she and her comparator, both professors in the biology department, performed equivalent work), *reheard en banc on other grounds,* 114 F.3d 1332 (2d Cir. 1997), *abrogated on other grounds by Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *Drury*, 2007 WL 737486, at *3 (rejecting argument that by virtue of their vice president titles, comparators performed the same work as plaintiff); *Sobol* v. *Kidder, Peabody & Co.*, 49 F. Supp. 2d 208, 219 (S.D.N.Y. 1999) (affirming arbitration award in favor of defendant, noting that plaintiff had not shown that heads of two different departments at a bank performed equal work); *see also Reznick* v. *Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 391 (5th Cir. 2004) (summary order)

(finding that two orthopedic surgeons did not perform substantially equal work where each doctor practiced a different sub-specialty).

The fact that department heads at AMC may have shared some common administrative responsibilities is likewise insufficient to salvage Plaintiff's EPA and NYLL claims, especially when weighed against the various differences in job content between and among Plaintiff and her alleged comparators. *See Drury*, 2007 WL 737486, at *3 ("Although plaintiff is correct that both she and Leung were classified as 'Vice Presidents' and that a few of their responsibilities, such as managing technology personnel and overseeing quality assurance, were similar, that simply is not enough under the Equal Pay Act."). Likewise, any overlapping fundraising responsibilities cannot establish that Plaintiff and her alleged comparators performed substantially equal work, given the plethora of differences in actual job content.

Finally, as to Dr. Palma, arguably the closest comparator, the evidence reveals that the content of his job and Plaintiff's job was not substantially similar in light of the differences in their practices, patient loads, teaching responsibilities, and research contributions. Put simply, no reasonable juror could conclude that Plaintiff performed work that was substantially equal to that of any of the comparators she identified, and, as a consequence, Defendants' motion for summary judgment on the EPA and NYLL claims must be granted.

### 2. Plaintiff's Tortious Interference and Defamation Claims Are Dismissed Without Prejudice

Where a federal district court "dismisse[s] all claims over which it has original jurisdiction," that court has discretion over whether to exercise supplemental jurisdiction over the plaintiff's remaining state law causes of action.  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation and quotation marks omitted); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("[W]hen the federal claims are dismissed the 'state claims should be dismissed as well.'" (quoting *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966))).

Plaintiff's federal claim having been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's tortious interference and defamation claims.  *See Cooney* v. *Consol. Edison*, 220 F. Supp. 2d 241, 254 (S.D.N.Y. 2002) (declining to exercise supplemental jurisdiction over defamation claim); *Noyer* v. *Viacom, Inc.*, 22 F. Supp. 2d 301, 308 (S.D.N.Y. 1998) (declining to exercise supplemental jurisdiction over tortious interference claims).  These claims are therefore dismissed without prejudice to their potential refiling in state court.

**CONCLUSION**

For the reasons discussed in this Opinion, Defendants' motion for summary judgment is GRANTED, and Plaintiff's EPA and NYLL claims are dismissed with prejudice.  Because the Court has declined to exercise supplemental jurisdiction, the remaining state law claims are dismissed without prejudice.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and mark this case closed.

SO ORDERED.

Dated:      January 7, 2016
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

33